DELBERT W. COLEMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROSE MEISEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coleman v. Commissioner
Docket Nos. 12336-80, 12337-80.
United States Tax Court
T.C. Memo 1987-195; 1987 Tax Ct. Memo LEXIS 191; 53 T.C.M. (CCH) 598; T.C.M. (RIA) 87195; April 13, 1987. Henry G. Zapruder,Roger A. Pies, and David J. Fischer, for the petitioners. John M. Elias,Brian S. Masumoto,Frank Lavadera, and Ralph Eppensteiner for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes for the taxable year 1976: Docket No.
Deficiency
12336-80
$132,176.10
12337-80
$ 41,673.00
The issues for decision are: 1) Whether the transaction by which Bari Associates acquired the subject *192 property was so devoid of economic substance that it must be disregarded for Federal tax purposes; 2) Whether Bari Associates acquired sufficient benefits and burdens of ownership to be considered the owner of the subject property for Federal tax purposes; 3) Whether Bari Associates entered into the subject transaction with a bona fide intent to make a profit independent of tax considerations; 4) Whether nonrecourse debt used in the subject transaction had sufficient economic substance to support the partnership's claimed depreciation and interest expense deductions; and 5) If any depreciation is allowable to Bari Associates for the subject property, whether the half year convention of section 1.167(a)-11(c)(2)(iii), Income Tax Regs., should be applied on the basis of a short taxable year for the year in which Bari Associates first engaged in its rental activity. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Delbert W. Coleman (Coleman) resided in Chicago, Illinois at the time of the filing of his petition herein. Petitioner Rose Meisel (Meisel) *193 resided in Cleveland, ohio at the time of the filing of her petition herein. Bari Associates
Bari Associates (Bari) was formed on December 27, 1974 as a limited partnership under the Connecticut Limited Partnership Act. Gerald Sanderoff (Sanderoff) contributed $5 to the capital of Bari as general partner and Carolyn Spitz contributed $95 as a limited partner. Sanderoff expected to resign as general partner when Bari was prepared to enter into an investment transaction. Pursuant to an amendment of the limited partnership agreement (Partnership Agreement) executed on June 30, 1975, Henry Levine (Levine) became the sole general partner of Bari and 22 additional limited partners were admitted, including Coleman and IC Capital Corp. Sanderoff became a limited partner. The amount of $1,900,000 was contributed to the capital of Bari on June 30, 1975 by the general partner and the new limited partners, including a contribution of $150,000 by Coleman, a contribution of $20,000 by Levine, and a contribution of $290,000 by IC Capital Corp. The amounts contributed by each of the partners were deposited in Bari's account at the Central State Bank of New York. IC Capital Corp. was *194 a corporation duly formed and existing on June 30, 1975, under the laws of the State of Delaware. Stephen Mann, who signed the Partnership Agreement on behalf of IC Capital Corp., was vice-president and sole shareholder of IC Capital Corp. On July 9, 1975, IC Capital Corp. assigned 15/290ths of its interest in Bari to Meisel in exchange for payment of the amount of $15,000 and Meisel was admitted to Bari as a substitute limited partner. CIG and CIG Products
CIG Computer Products, Inc. (CIG Products) was a Delaware corporation all of the stock of which was owned by Computer Investors Group, Inc. (CIG), a New York corporation. The stock of CIG was publicly held during 1975 and was traded on the American Stock Exchange. Neither Bari nor any of the partners of Bari had any interest in, or control over CIG, CIG Products, or their management during calendar year 1975 or any prior or subsequent period. For many years prior to 1975 and for the years in issue herein, CIG and CIG Products were engaged in the business of selling and leasing electronic data processing equipment, principally International Business Machines Corporation (IBM) 360 and 370 model computers and related *195 equipment. CIG and CIG Products were also engaged in selling and leasing equipment manufactured by others for use with IBM computers, and in furnishing computer related services. CIG was in poor financial condition in June 1975 and the Bari transaction (described infra) was viewed as necessary in order to remain financially viable. The Transaction
On June 30, 1975, Bari entered into an agreement to purchase certain computer equipment from CIG Products for an aggregate purchase price of $25,000,000. The equipment consisted of approximately 1,700 pieces of computer equipment, principally IBM 360 and 370 models and related compatible equipment manufactured by IBM and others. First National City Bank, for itself and as agent for National Bank of North America, held a first lien security interest in the equipment securing indebtedness of CIG Products to the banks in an amount, on June 30, 1975, not in excess of $21,000,000. At the time of the transaction, the equipment was subject to end-user leases between CIG Products and various third parties. Bari made payment for the equipment with $1,900,000 in cash and a nonnegotiable, nonrecourse, "wrap-around" promissory note *196 (the Bari Note) payable to CIG Products in the amount of $23,100,000, secured by the equipment. The Bari Note was repayable in installments over a 96-month period at the rate of $240,625 (interest only) for the first 6 months, $352,819 per month (principal and interest) for the next 30 months, $330,615 per month (principal and interest) for the next 60 months and $6,500,000 (principal only) on June 30, 1983. The total payments (principal and interest) due over the term of the note were $38,347,220. Under the terms of the purchase agreement and an amendment and modification of the purchase agreement, both dated June 30, 1975, Bari agreed that its interest in the equipment was subordinate to the rights of First National City Bank for itself and as agent for National Bank of North America. CIG Products represented that, on the date of the transaction, all user leases noted in the equipment list were in full force and effect. CIG and CIG Products also warranted that there had been no material adverse change in their financial or other condition since March 31, 1975, the date of their unaudited consolidated balance sheet. The Bari Note was secured under a security agreement (the *197 Security Agreement) dated June 30, 1975. The rights and remedies of CIG Products for payment, performance, and observance by Bari of all its obligations were limited to the appropriate provisions of the Security Agreement. Under the terms of the Security Agreement, CIG Products would look only to the equipment for recourse, and waived all rights to seek payment from Bari, its officers, or directors [sic] in the event of default. Also on June 30, 1975, Bari entered into an agreement (Lease) to lease the same equipment back to CIG Products for a term of 96 months. The Lease required CIG Products to make monthly rental payments of $246,875 per month for the first 6 months and $359,069 per month for the next 90 months for a total of $33,797,460 over the 96-month term. The Lease allowed Bari to defer payment of, or set off, the amount of any rental payments or other expenses for which CIG Products was in default, against amounts which were due to CIG Products under the Bari Note. Under the terms of the Lease, CIG Products was required to pay Bari, in addition to rent, an amount equal to all taxes paid, payable or required to be collected by Bari in connection with the equipment. *198 CIG Products was also responsible "for all costs and expenses of any nature whatsoever, arising out of or in connection with or related to this Lease or the Equipment," unless specifically provided for otherwise. CIG Products agreed to maintain the equipment in good working order and make all necessary repairs at its own cost. The Lease also required CIG Products to assume "all risks of physical damage to, or loss or destruction of, the Equipment, howsoever caused" and further to insure the equipment at its own expense, at the full insurable value. The terms of the Lease required CIG Products to hold harmless and indemnify Bari for any liability arising with respect to the equipment. Under the terms of the Lease, CIG Products could dispose of the equipment or any part thereof and simultaneously substitute like-kind equipment with the same fair market value. CIG Products was also permitted to sublease the equipment and could enter into subleases on a commercially reasonable basis which extended beyond the term of the lease. If a sublease existed beyond the term of the Lease, Bari would assume all rights and obligations of CIG Products at the end of the Lease term with respect *199 to such sublease if Bari made the final payment on the Bari Note. CIG Products was permitted by the Lease terms to incur new underlying liens on the equipment up to $26,000,000 until March of 1977. Thereafter, CIG Products could incur new underlying liens only up to the greater of the outstanding balance of the Bari Note or "firm rentals," defined as the present value of all rentals payable on or before June 30, 1983, assuming that all subleases were terminated by the sublessee at the earliest time permitted. All liens were required to be discharged upon full payment of the Bari Note. If the rental payments under the Lease and debt service payments under the Bari Note were made as required, Bari would have cash flow, before expenses, in the amounts of $6,250 per month for the first 36 months and $28,754 for the next 60 months for a total of $1,950,240 over the term, before payment of the final $6,500,000 principal installment. Absent a consideration of expenses, Bari would recover $50,240 in excess of its cash down payment of $1,900,000 by the time the final installment became due. Bari obtained the services of CIG Products to manage the equipment and arrange for leases or *200 sales of the equipment after June 30, 1983 under a management agreement (the Management Agreement). In exchange for its services, CIG Products was entitled to a fee in the amount of the lesser of 50 percent of net proceeds or 125 percent of expenses. Bari would retain the entire proceeds of sale, less the amount of the fee to CIG Products. CIG guaranteed the obligations of CIG Products under the Lease, the Security Agreement, and the Management Agreement. Neither CIG, CIG Products, nor any other person had an option to purchase the equipment from Bari at less than its fair market value at any time. Structuring the Transaction
Gordon, Hurwitz, Butowsky and Baker (Gordon Hurwitz), a firm of attorneys practicing in New York City, was legal counsel to Bari in connection with the transaction in question and represented Bari in negotiations with CIG and CIG Products. David N. Hurwitz (Hurwitz) and Barry Shalov, partners in the above firm, were primarily responsible for providing the legal services to Bari. Levine executed a power of attorney on his own behalf and as general partner of Bari, which appointed Hurwitz, Barry Shalov, or their partners in Gordon Hurwitz, Marc Weitzen *201 and C. Martin Goldenberg, representatives and attorneys-in-fact to act on behalf of Levine and Bari in connection with the transaction. CIG and CIG Products were primarily represented by Milton Zeughauser (Zeughauser) and John Jelillian in the negotiations with Bari. Steven Mann, an attorney with the law firm Trubin Silcox of New York, was general counsel to CIG and participated in negotiations and discussions on behalf of CIG. Multi-National Capital Corp. (Multi-National), through Richard Firestone (Firestone), a 70 percent or more stockholder, was the equipment broker for the transaction in question. Firestone's equipment brokerage firm was responsible for originally forming Bari as one of over 100 inactive partnerships held "in inventory" which had been formed in advance on the advice of Gordon Hurwitz. Sanderoff, the original general partner of Bari, was Firestone's cousin. Firestone contacted Hurwitz shortly after May 9, 1975 and informed Hurwitz that CIG was interested in selling equipment for a price of approximately $25,000,000 and a cash down payment of $3,000,000, which was negotiable. After this introduction, negotiations commenced between the representatives of *202 Bari and CIG without further involvement of Multi-National or Firestone. Multi-National was compensated for its equipment brokerage services by CIG, for whom such services were provided. This compensation was in the amount of $127,500. Hurwitz visited CIG at its offices in Connecticut and spoke with several individuals, including Zeughauser. Hurwitz further discussed the proposal with Zeughauser and others, including CIG's general counsel Mann, in subsequent telephone conversations as well as in face-to-face meetings at CIG. Hurwitz understood CIG's need for capital to be no more or less than that of any other equipment lessor. Hurwitz also discussed the transaction with his law partner Barry Shalov. Hurwitz learned that the computers involved in this transaction would be IBM 360's and 370's and some peripheral equipment of various manufacturers. Hurwitz knew in general that IBM 370's were better and more valuable than 360's. Hurwitz formed his opinion of IBM 360's and 370's based upon his experience as tax counsel for Firestone, who structured equipment leasing transactions involving similar types of computers. Hurwitz also based his opinion of IBM 360's and 370's upon *203 exposure to transactions brought to him by other brokers and investment bankers. CIG originally proposed to sell approximately $25,000,000 worth of computer equipment on terms which included a cash down payment in the approximate amount of $3,000,000 and purchase-money financing in the approximate amount of $22,000,000. As finally settled on, the transaction involved a down payment of $1,900,000 and purchase-money financing in the amount of $23,100,000. As late as the day of closing, Hurwitz indicated to CIG that insufficient money was available to fund the $1,900,000 down payment. Hurwitz indicated that CIG could agree to a lower down payment and increase the purchase-money financing it would provide or forego the sale. At this point, IC Capital Corp. contributed to Bari the balance of the planned down payment for use in the deal. Jerry Silverman Associates, Inc. (Silverman Associates) was engaged by CIG in May of 1975 to (1) perform an appraisal of the fair market value of the equipment, and (2) estimate the value the equipment would have on June 30, 1983. Silverman Associates was recommended by Firestone and had not previously worked with CIG. Silverman Associates charged *204 CIG $3,000 for the fair market value and residual value estimates, $1,000 of which was paid prior to June 30, 1975 and the remainder at a later date. Robert Lew (Lew) performed and delivered the fair market value and residual value estimates on behalf of Silverman Associates. In 1975, Lew was self-employed as a full-time consultant to Time, Inc., Datran Co., and ITT, among others, in the areas of data communications and broad band communications. Lew provided appraisal services to Silverman Associates with respect to technologically based equipment on a part-time basis. Lew performed appraisals on a myriad of different kinds of equipment including computers, photocopy machines, and medical equipment. The appraisals were both dated June 30, 1975, the date on which they were completed and typed. The appraisals were made available to Hurwitz on June 30, 1975, the date of closing. When initially contacted, Lew had been requested to state that he believed the equipment to have a useful economic life in excess of at least ten years. Lew's fair market value appraisal determined that the fair market value of the equipment was at least $25,357,993. This estimate was made "without *205 regard to any liens, security interests or any other encumbrances on the equipment, the location of the equipment, or the good will or going concern value of the business in which the equipment is used * * *." Lew's fair market value appraisal also stated that the rent to be paid by CIG Products was consistent with the rents being paid for similar equipment at the time. Lew's residual value appraisal estimated that the fair market value of the equipment on June 30, 1983 was expected to be at least $6,669,150, and that a value of $7,580,000 was a reasonable expectation. The residual value appraisal also stated that the expected economic useful life of the equipment from the date of the appraisal was at least ten years. The residual value appraisal represented that it was made without regard to the possibility of inflation or deflation and did not take into consideration the same factors which the fair market value appraisal stated that it did not take into consideration. The residual value appraisal stated that it was based on (1) a review of the residual values at the time of the transaction, of equipment of the same nature as the subject equipment, (2) consideration of standard *206 factors such as normal wear and tear and the market demand for equipment of the age, type, and utilization of the subject equipment, (3) an on-site inspection of representative pieces of equipment, and (4) a review of the general type of maintenance agreements required in transactions of this type to insure that the property will be kept in a good state of repair. Sometime in May or June of 1975, Hurwitz contacted Levine regarding the Bari investment. In June of 1975, Hurwitz and Levine had known each other because of their joint representation of certain clients. Levine was a certified public accountant who had been in practice for approximately 20 years. Levine's primary services were business management for entertainment people, which involved representation, investment advice, tax planning, and accounting and bookkeeping services. During his initial telephone conversation with Levine, Hurwitz described the investment in general terms and inquired whether Levine would be interested in becoming general partner of Bari. At the time of this conversation, the terms of Bari's purchase and lease to CIG Products, including the cash down payment, financing terms, rental payments, *207 and lease term, were substantially agreed upon. Levine expressed interest in the investment and inquired whether the investment would also be suitable for some of his clients. After several conversations with Hurwitz and other members of Gordon Hurwitz, Levine decided that he would invest in Bari on his own behalf, serve as general partner, and recommend the investment to or invest on behalf of several of his clients. Bari received an opinion of counsel for CIG and CIG Products: (1) that the underlying user leases on the equipment were in full force and effect, valid and enforceable; (2) that CIG Products was conveying good and marketable title to the equipment, subject only to certain liens; (3) that CIG and CIG Products had legal authority to enter into and carry out the transaction; (4) that the execution of documents and performance of obligations under the documents were authorized and would bind CIG and CIG Products; (5) that the consummation of the transaction did not violate any other agreement by CIG and CIG Products; and (6) that CIG and CIG Products obtained all the consents of third parties necessary to complete the transaction. CIG Products requested and received *208 an opinion from counsel to Bari as to Bari's legal status and that Bari had the power and authority to enter the transaction. Operation of Bari
Bari filed the necessary documents in 1975 in each state in which equipment was located to enable it to conduct the business of leasing personal property in those states. The equipment purchased was located in forty one states, but was all within the United States. Bari executed "Certificates of Purchase for Resale" for each jurisdiction in which equipment was located for which such certificates were required. These certificates were prepared to allow CIG Products to claim exemption from or deductions against state sales taxes which would otherwise arise in connection with the sale of the equipment to Bari. CIG also executed "Certificates of Purchase for Resale" for each jurisdiction in which equipment was located for which such certificates were required. These certificates were prepared by CIG Products to allow Bari to claim exemption from or deductions against state sales and use taxes which might otherwise arise in connection with the lease of the equipment to CIG Products. CIG Products perfected its security interest in *209 the equipment under the Bari Note and Security Agreement by filing financing statements, Forms UCC-1, in all relevant jurisdictions. Bari filed sales and use tax or other relevant state tax returns or license forms where necessary. Bari paid any necessary license fees and referred any significant sales tax liabilities to CIG Products for payment under the terms of the Lease. The general partner of Bari kept complete books and records indicating the receipts, disbursements, assets, liabilities, and Federal income tax information for the Bari partnership. For its consolidated Federal income tax return filed for the period ended March 31, 1976, CIG reported the Bari transaction as an installment sale and reported its gain pursuant to the installment reporting provisions of section 453. [1] For each subsequent year, CIG Products (and later CIG) reported income form the sale of the equipment, interest income from Bari, and deducted rent paid to Bari on its Federal corporate income tax return. CIG and CIG Products did not claim depreciation deductions for the equipment after June 30, 1975. *210 CIG Products was liquidated into CIG as of March 31, 1978. At that time CIG assumed all the rights and obligations of CIG Products under the transaction documents and the Management Agreement. Bari was notified of this liquidation. CIG Products, and later CIG, made the rental payments to Bari as required under the Lease for the months from and including July 1975 through June 1980. Bari made the payments of principal and interest required by the Bari Note for the months from and including July 1975 through June 1980. The difference between rental receipts and Bari Note payments, less miscellaneous expenses in small amounts, was distributed to the partners in Bari regularly in accordance with the Partnership Agreement. At the beginning of 1980, several officers of CIG resigned or were replaced. After this time, no officers remained at CIG who had participated in the transaction with Bari. In July 1980, CIG ceased making rental payments to Bari. After a period of negotiations, CIG resumed rental payments and made additional payments to satisfy previously unpaid rental obligations. In mid 1981, however, CIG again failed to meet its rental obligations under the Lease and stopped *211 making the required additional payments. In December 1981, Bari filed suit against CIG in the District Court for the Southern District of New York. This suit was settled in early 1983. The settlement provided for CIG to make its rental payments on a modified schedule and allowed CIG to reduce the overall rent it would pay by approximately $400,000. Bari's payments on the Bari Note were not reduced but were rescheduled in accord with CIG's obligations. In June 1983, at the termination of the Lease, the fair market value of the equipment was substantially less than the amount owed by Bari to CIG pursuant to the Bari Note. CIG obtained legal title to the equipment in June 1983, as a result of Bari's failure to make the required payments. Bari did not pay the remaining amount due on the Bari Note after foreclosure by CIG. Returns
On its 1975 partnership return, Form 1065, Bari adopted the calendar year as its taxable year and the cash method of reporting income and expenses and elected to use the modified half-year convention for computing first-year depreciation of its assets under the Asset Depreciation Range system. Bari reported deductible expenses in excess of income *212 in the amount of $7,462,564 for its 1975 taxable year and in the amount of $2,390,775 for its 1976 taxable year. OPINION Because we believe that it is fully dispositive of this case, the only issue we will consider is whether Bari acquired sufficient benefits and burdens of ownership to be treated as the owner of the equipment for Federal tax purposes. Respondent contends that Bari does not possess sufficient attributes of ownership to be considered the owner of the equipment. Petitioner's position is to the contrary. In Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981), we stated, The "term" sale is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership have passed * * * to petitioners. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and *213 circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). * * * [77 T.C. at 1237.] While the decision of whether a taxpayer has acquired sufficient benefits and burdens of ownership should generally be based on a review of all relevant facts, certain factors have been found particularly enlightening with respect to this issue in the sale leaseback context. These factors include: (1) whether useful life in excess of the leaseback term and significant residual value are reasonably expected to exist; (2) whether the parties treated the transaction as a sale; (3) whether legal title passed; (4) whether the contract of sale creates a present obligation on the purchaser to make payments; (5) whether any other party holds a purchase option at less than fair market value; (6) whether renewal rental at the end of the leaseback term is set at fair market rent; and (7) whether the purported owner of the property had a reasonable possibility to recoup his investment in the property from the income producing potential and residual value of the property. Torres v. Commissioner, 88 T.C.     (Mar. 30, 1987); *214 see also Mukerji v. Commissioner,87 T.C. 926 (1986); Estate of Thomas v. Commissioner,84 T.C. 412 (1985). The weight to be given to any one of these factors may vary depending upon the circumstances of the case. The parties here have few disagreements with regards to the terms of the transaction as set out in the documentation and intended by Bari and CIG. The transaction, at least in form, was a sale leaseback of the subject equipment which would involve fixed lease payments over the term of the lease sufficient to amortize all payments due on the purchase money obligation during the term of the lease, and return Bari approximately $50,000 in excess of its investment prior to the balloon payment becoming due. The parties disagree, however, on whether Bari acquired sufficient attributes of ownership with respect to the property by way of entering this transaction. The parties concentrate a significant portion of their arguments on the relation of the reasonably expected residual value of the equipment and the amount of the balloon payment due at the end of the lease term. As such, we will begin our analysis of this issue with a review of the *215 evidence offered on the residual value which the property could reasonably have been expected to have on June 30, 1983, from the perspective of an investor in June of 1975. Frederic G. Withington (Withington) testified as an expert witness for respondent with respect to the fair market value and expected residual value of the equipment. Withington holds a Bachelor's degree in Physics and has 32 years of experience in the computer field. Upon graduation from college he was employed as a programmer and later as a programming supervisor by the National Security Agency. Subsequently, he was employed by the Burroughs Corporation in product planning and customer support. In 1960, Withington joined Arthur D. Little, Inc., his current employer. Withington's duties and responsibilities at Arthur D. Little, Inc., include a variety of consulting assignments for clients involved in the data processing industry. Primarily, he assists clients in the preparation of long-range plans, acquisition of equipment, and organizational matters. Secondarily, he assists manufacturers and other participants in the data processing industry, including leasing firms, by providing technical advice, forecasts, *216 and product planning services. Withington began conducting residual value studies in 1964, and has since conducted two to four such studies per year. Withington determined that the estimated fair market value of the equipment as of June 30, 1975, was $22,638,033. Withington testified, however, that $25,000,000 was not outside the expected "vagaries" of the market with respect to the fair market value of the equipment. Withington determined the fair market value of the equipment by identifying the specific equipment and obtaining the original list purchase price as offered by the manufacturer. He next referred to the Computer Price Guide [2] and located the asking prices of various types of equipment. Withington then computed the percentage of the original list price represented by the asking price. Withington valued each separately priced item individually, and factored in considerations that he believed affected different models and different features. In preparing a residual value *217 forecast, Withington relied upon contempary documents and reports which he had prepared for Arthur D. Little, Inc., dated February 1974, February 1975, and May 1975. In some instances it was necessary for Withington to extrapolate upon the findings in his reports to arrive at his projected residual value since a particular report might not carry the projection to June 1983. Withington's determination included an uncertainty range that varied according to the type of equipment and the various market factors that were likely to have an impact on resale. Withington selected the midpoint of the uncertainty ranges contained in his reports to arrive at an estimated residual value of $2,092,093. Withington computed the uncertainty range for this figure to be plus or minus $200,000. Svend Hartmann (Hartmann) testified and provided a written report on behalf of petitioners regarding the fair market value and expected residual value of the equipment. Hartmann is president of Computer Merchants, Inc., a broker and dealer of used computer equipment and publisher of the Computer Price Guide. Hartmann has been president of Computer Merchants, Inc., since 1974. A newsletter entitled the *218 Computer Price Guide Reader's Report has been published on a quarterly basis together with the Computer Price Guide since 1971. The Reader's Report contains comments and evaluations of current and expected market trends for used computers. Hartmann has been author of the Reader's Report since its inception. Hartmann provided appraisals of the fair market value of used computer equipment before, during and after 1975, as well as daily advice regarding purchases over the telephone. Since 1974, however, the principal business of Computer Merchants, Inc., has been the sale of used computers and peripheral equipment. Hartmann determined the value of the equipment as of June 30, 1975 to be $25,155,000, looking only to the equipment and not to the terms of the investment. Hartmann testified that a purchaser of equipment such as the equipment under the terms of this investment, would have paid a premium for the equipment. This premium, according to Hartmann, would be principally attributable to two factors: (1) much of the equipment was installed and in place so that no costs of freight, transportation, or installation would arise, and (2) the fact that the equipment was (or would *219 be) leased to third parties by the lessee of the equipment would add to the potential future revenue stream from the equipment because users tend to stay with the equipment they are using. Hartmann estimated that the premium which would be paid for the investment would range from 5 percent to 15 percent of the purchase price. Hartmann used a 10 percent figure to estimate a fair market value for the equipment of $27,441,000, taking into account the premium. The arm's-length purchase price of computer equipment which is on lease and which does not have to be transported, refurbished, or installed, normally reflects a premium over the price for that equipment listed in the Computer Price Guide. Hartmann testified that he would, in 1975, have projected the residual value of the equipment in 1983 to be between $2,467,000 and $8,580,000. Hartmanns' methodology for determining residual value was to determine his expectations of the remaining economic useful life of the various classes of the equipment in 1975, and project values within the range indicated by graphing a straight line from 100 percent on June 30, 1975 to 0 percent at the end of the economic useful life of the equipment. *220 Hartmann took into account that each item of equipment would decline at slightly different rates. In Hartmann's opinion, the aggregate decline in value of the equipment would approximate a straight line. With respect to the fair market value and residual value estimates made by Lew, we note that Hurwitz did not review these estimates until the date of closing and that the estimates were done for CIG, an adverse party in the negotiations. Petitioners argue, and Hurwitz testified, that the entire transaction was conditioned upon an appraisal demonstrating that the fair market value of the equipment was at least that agreed to by the parties and demonstrating that the residual value of the equipment could reasonably be expected to exceed $6,500,000 on June 30, 1983. Hurwitz negotiated a transaction the viability of which, according to his own testimony, depended upon the equipment having a reasonable likelihood of residual value in excess of the balloon payment at the end of the lease term. Hurwitz admitted that expected residual value was difficult to determine and that he was not qualified to make such a determination. Nevertheless, Hurwitz negotiated the terms of the transaction *221 without the benefit of an appraiser's opinion of the expected residual value of the equipment. We are not convinced that the transaction was conditioned upon the estimates in Lew's appraisal or that Lew's appraisal had any impact on the terms of the transaction as negotiated by the parties. Further, Lew was called at trial to testify about his appraisals, but could not recall any specific details about the preparation of the appraisals or the information he received as a basis for preparing the appraisals. The appraisal itself is a one page form letter which does not identify the method by which it was prepared. On this record, we find that (1) petitioners have not demonstrated that Lew's appraisals were in fact relied on by the general partner or counsel of Bari in entering this transaction, and (2) we have not been presented with sufficient facts regarding the preparation of the appraisals by Lew to determine whether reliance on the appraisals would have been reasonable at the time the transaction was consumated. Based on the above and the fact that Lew did not testify as an expert witness, we will not consider Lew's appraisal or testimony with respect to fair market value *222 and residual value in making a decision in this case. Withington's and Hartmann's estimates of fair market value and expected residual value are summarized as follows: Fair Market Value
Residual Value
Withington
$22,638,033
$1,892,093 to
$2,292,093
Hartmann
$25,255,000 to
$2,467,000 to
$27,441,000
$8,580,000
Based upon these appraisals and Withington's testimony, we find that the price agreed to by the parties was approximately equal to the fair market value of the equipment as of June 30, 1975. [3] On the facts of this case, however, whether the residual value of the equipment could reasonably be expected to exceed the amount of the balloon payment due at the end of the lease term bears greatly on the determination of whether Bari acquired sufficient benefits and burdens of ownership. This can be demonstrated by a comparison of the two possible residual value scenarios. *223 If the residual value of the equipment exceeds the amount of the balloon payment at the end of the lease term, Bari's economically prudent decision would be to pay the balloon payment and either continue to lease the equipment or sell the equipment at its then market value. By making the payment Bari could earn a profit in excess of the $50,000 profit resulting from the contractual agreements of the parties. The amount of this profit would depend upon the market value or income producing potential of the property at such time. If the residual value of the equipment, however, does not exceed the amount of the balloon payment due at the end of the lease term, Bari's economically prudent decision would be to refuse to pay the balloon payment and allow CIG to foreclose on the property at the end of the lease term. Making the balloon payment would create the likelihood of turning a virtually guaranteed $50,000 profit into a loss. Under this second scenario, the foreseeable course of the transaction would have Bari paying CIG a lump sum of $1,900,000 in exchange for fixed payments over eight years of $1,950,240. Bari's profit on the transaction would be solely the result of the *224 difference between the fixed lease payments and the purchase debt payments agreed to by the parties and bear no relation to either the residual value or income producing potential of the property. At no time during or after the term of the lease would Bari have any possessory rights with respect to the equipment. Bari's position in this transaction would be indistinguishable from that of a financier. Bari's potential for profit would be capped by the amount contractually agreed to by the parties and Bari's risk of not receiving such profit would hinge solely on CIG's ability and willingness to make required payments. [4]
We note initially that Withington's and Hartmann's residual value predictions differ significantly both as to approach and as to result. Withington's predictions were prepared based on residual value studies of IBM *225 360 and 370 equipment done by Withington at a time very close to the time at which this transaction was consummated. Hartmann's predictions had no such basis. Further, Withington predicted a residual value within a range of approximately $400,000. Hartmann, on the other hand, gave a prediction with a range in excess of $6,000,000, more than three times Bari's total investment in the property and ranging from more than $4,000,000 below the amount of the balloon payment to $2,000,000 above the amount of the balloon payment. At trial, Hartmann testified that his residual value predictions might have been different in several respects had they actually been done in 1975. Hartmann stated that this was because in 1975 he would have had more contemporaneous information bearing on the factors which affect residual value predictions and because it is difficult to avoid hindsight in making retrospective residual value predictions. Hartmann stated that had he actually done the residual value predictions in 1975, he could have plotted actual residual value curves for separate items of equipment, rather than using straight-line approximations for groups of equipment. Hartmann testified that *226 the groups of curves which would result would "most likely" resolve into an approximation of a straight line which would be no more accurate a prediction of residual value than his straight-line prediction. Hartmann failed, however, to adequately explain why such a phenomenon would be "most likely" to occur. Hartmann also stated that had he done an appraisal in 1975, the range of values predicted would "very probably" have been narrower because of the greater amount of information which would have been available. Withington's residual value predictions were based upon the residual value studies he had performed in 1974 and 1975 and, therefore, were clearly based on the information available in the market at the time the transaction in issue occurred. We find Withington's prediction of the expected residual value of the Bari portfolio to be reasonably based on these studies and to reflect most closely what an expert on such equipment would have predicted in 1975. The nature of Withington's residual value report is inherently more reliable because of these facts. Further, the range of values predicted by Hartmann we believe to be so broad that an investor in 1975 would be incapable *227 of using it as a basis upon which to make an investment decision. This $6,000,000 range on an investment of only $1,900,000 is of little utility when its midpoint falls $1,000,000 below the amount of the balloon payment. The utility of this prediction is further discredited by Hartmann's testimony that he could not say whether any particular value within this range was more likely to occur than any other value within the range. Based on the above, we find that had Bari, in 1975, sought the opinion of a competent expert on the expected residual value of the computer equipment, an appraisal would have resulted which would have made predictions in line with those made by Withington. See Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980). Petitioners have made numerous detailed objections to Withington's report, but none of these objections would come close to causing upward adjustments to Withington's predictions by the more than 200 percent necessary to bring the residual value prediction up to the amount of the balloon payment. As such, we find that had Bari sought an expert appraisal in 1975, Bari would not have had a reasonable expectation *228 of paying the balloon payment at the end of the lease term. Therefore, the foreseeable course of this transaction was that Bari would pay CIG a lump sum of $1,900,000 in exchange for fixed payments over eight years of $1,950,240. Bari's profit on the transaction (other than tax benefits) would result solely from the fixed payments contractually agreed to by the parties and would bear no relation to either the residual value or income producing potential of the property. At no time during or after the term of the lease was Bari to have any possessory rights with respect to the equipment. Accordingly, Bari's position in this transaction is indistinguishable from that of a financier. Bari's potential for profit was capped by the amount contractually agreed to by the parties and Bari's risk of not receiving such profit hinged solely on CIG's ability and willingness to make required payments, rather than relating to the value and income-producing potential of the property. The facts of this case are distinguishable from those in Estate of Thomas v. Commissioner,supra. In Estate of Thomas, we held that the profitability of the equipment investment therein *229 was expected to turn on the residual value of the equipment and that an economic profit was reasonably likely based on the expected residual value. 84 T.C. at 433, 439. In that case, the residual value of the property controlled both the profit potential and the risk of the investment. In contrast, we have found that the profit potential and the risk of Bari's investment had no relation to the underlying equipment, but rather depended solely on the contractual terms agreed to by the parties and on CIG's financial position. We do not believe that a discussion of the other factors which are sometimes relevant to a determination of ownership for Federal tax purposes could possibly revive this transaction in light of the facts discussed above. Accordingly, we find that Bari was not the owner of the equipment for Federal tax purposes and that petitioners are not entitled to deductions based upon such purported ownership. [5]
Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The Computer Price Guide is the standard and principal reference source for prices in the used computer market. See Mukerji v. Commissioner,87 T.C. 926, 946-947↩ (1986).
3. Petitioners offered the testimony and reports of two other expert witnesses with respect to the fair market value of the equipment on June 30, 1975. Because we accept that the price set by the parties was approximately equal to the equipment's fair market value, we will not discuss the views of these experts. The residual value of the equipment was not estimated by these two experts.↩
4. The fact that $50,000 of interest over eight years on a loan of $1,900,000 is far less than that which a true financier would expect apparently was not important to the investors. The form of the transaction was such that the parties would have expected the tax benefits received by the purchaser/financier to supplement such interest amounts.↩
5. This holding makes it unnecessary for us to discuss any of the other issues raised by the parties.↩