DELBERT W. COLEMAN AND KAREN A. GRAHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coleman v. Commissioner
Docket No. 48659-86
United States Tax Court
T.C. Memo 1990-99; 1990 Tax Ct. Memo LEXIS 105; 58 T.C.M. (CCH) 1525; T.C.M. (RIA) 90099; February 28, 1990
*105 Held: Petitioners are not entitled to deduct a partnership loss arising from a partnership's claimed deductions relating to a sale/leaseback of computer equipment. The partnership did not acquire sufficient benefits and burdens of ownership to be treated as the owner of the computer equipment for Federal tax purposes. Coleman v. Commissioner, T.C. Memo. 1987-195, and Coleman v. Commissioner, T.C. Memo. 1989-248, controlling. Held further: The sale/leaseback transaction in issue was devoid of economic substance. Held further: Petitioners are liable for the increased rate of interest on a substantial underpayment attributable to a tax-motivated transaction, pursuant to section 6621 (c). Henry G. Zapruder, Roger A. Pies, and David J. Fischer, for the petitioners. Michael D. Wilder, for the respondent. WHITAKER
MEMORANDUM OPINION WHITAKER, Judge: By timely statutory notice dated September 29, 1986, respondent determined a deficiency in petitioners' 1975 Federal income tax of $ 184,226 and the increased rate of interest on a substantial underpayment attributable to a tax-motivated transaction provided for in section 6621(d). [1]
*107 The issues for consideration are: (1) whether the transaction by which Bari Associates acquired certain computer equipment was so devoid of economic substance that it must be disregarded for Federal tax purposes; (2) whether Bari Associates entered into such transaction with a bona fide objective to make a profit independent of tax considerations; (3) whether Bari Associates acquired sufficient benefits and burdens of ownership to be considered the owner of the computer equipment for Federal tax purposes; (4) whether nonrecourse debt used in the subject transaction had sufficient economic substance to support Bari Associates claimed depreciation and interest expense deductions; (5) if any depreciation is allowable to Bari Associates, whether the half-year convention of section 1.167(a)-11(c)(2)(iii), Income Tax Regs., should be applied on the basis of a short taxable year for the year in which Bari Associates first engaged in rental of computer equipment; and (6) whether petitioners are subject to the increased rate of interest set forth in section 6621(c). Petitioners Delbert Coleman and Karen Graham were husband and wife during the year in issue, *108 and filed a joint return. At the time of filing the petition herein, Delbert Coleman resided in Chicago, Illinois, and Karen Graham resided in Pass Christian, Mississippi. All references to petitioner in the singular are to Delbert Coleman. Background
In Coleman v. Commissioner, T.C. Memo. 1987-195 (Coleman I) this Court held that petitioner, a partner in Bari Associates (Bari), was not entitled to deductions in 1976 based on Bari's purported purchase and leaseback of computer equipment because Bari was not the owner of the computer equipment for tax purposes. Critical to that determination was our finding that the residual value of the equipment at the end of the lease term was less than the final balloon payment due at that time on the nonrecourse debt used to finance the alleged purchase. The present case involves petitioner's claimed partnership loss in 1975 arising out of the same purported sale/leaseback transaction. Thus, the transaction in issue in this case is the transaction which we examined in Coleman I. Likewise, the issues in the present case, except for the increased rate of interest on any underpayment, are identical to the issues presented *109 in Coleman I. For purposes of the present case, the parties stipulated to the testimony, exhibits, and findings of Coleman I except as the testimony, exhibits, and findings pertain to the residual value of the computer equipment. Petitioners contended that evidence which was not produced pursuant to subpeona in Coleman I, and which had come to light since our decisions in that case and in a subsequent case, Coleman v. Commissioner, T.C. Memo. 1989-248 (Coleman I-A), would so materially change the record as to residual value that a second trial was justified. For purposes of the trial in Coleman I, a subpoena duces tecum was issued to respondent's valuation expert, Frederic G. Withington. Mr. Withington produced and relied on reports which he prepared in February 1974, February 1975, and May 1975. He testified that, as of June 1975, he would have projected the residual value of the computer equipment in June 1983 to be between $ 1,892,093 and $ 2,292,093. Svend Hartmann, petitioner's expert, projected the residual value to be between $ 2,467,000 and $ 8,580,000. We based our finding of residual value on Mr. Withington's testimony, finding it to be more reliable *110 and useful than Mr. Hartmann's testimony. However, Mr. Withington did not produce all documents which could possibly have fallen within the scope of the subpoena. After decision in Coleman I, petitioner moved to reopen the record or to hold an evidentiary hearing to receive a document which was not produced pursuant to the subpoena. Petitioner wished to offer a letter (the Levin letter), dated November 19, 1973, into evidence. In that letter, Mr. Withington purportedly projected a greater 1983 residual value for computer equipment similar to the Bari equipment than he had testified to at trial in Coleman I. We considered petitioner's motion in Coleman I-A. We concluded that the letter was consistent with Mr. Withington's testimony in Coleman I and therefore merely cumulative. Further, even had the letter been introduced at trial to impeach Mr. Withington's testimony, the testimony of petitioner's own expert did not support recognition of Bari's alleged computer purchase for tax purposes. For those reasons, and because introduction of the Levin letter would therefore not have changed the outcome in Coleman I, we denied petitioner's Motion to Reopen Record or for an Evidentiary *111 Hearing. Coleman v. Commissioner, T. C. Memo. 1989-248, 58 P-H Memo T.C. par. 89,248, 57 T.C.M. 493. By Order dated May 22, 1989, we directed petitioners to show cause why the decision in this case should not be controlled by the decisions in Coleman I and Coleman I-A. Petitioners argued that the Levin letter and other additional documents which had come to light justified a second trial on the 1983 residual value of the Bari computer equipment. Petitioners requested an evidentiary hearing for the purpose of examining Mr. Withington on those documents. Petitioners also sought to call Mr. Hartmann and Mr. Esmond Lyons to give additional expert testimony on the residual value of the computer equipment, should we find a second trial necessary. By Order dated July 31, 1989, we granted petitioners' request for an evidentiary hearing. The evidentiary hearing was held on October 12, 1989. We admitted into evidence the Levin letter and several other documents, prepared in whole or in part by Mr. Withington, which discussed valuations and forecasts pertaining to computer equipment. Those documents included: (1) Volume III of a 1974 report prepared for the United States *112 Air Force, containing price-performance projections for similar computer equipment in 1985; (2) a report prepared for Honeywell identifying computer market opportunities after 1977; (3) transcripts of Mr. Withington's computer valuation testimony in other Tax Court cases; and (4) several articles, comment letters, and reports relating to possible residual values, price performance, or forecasts of computer developments, prepared both before and after June 1975. Mr. Withington testified that he did not produce those documents for trial in Coleman I because they were either cumulative, redundant, or not relevant to the value of the Bari equipment. We agreed with Mr. Withington's conclusions. Therefore, expert testimony from Mr. Hartmann and Mr. Lyons in response to those documents would be needlessly cumulative or irrelevant. For that reason, by Order dated December 19, 1989, we denied petitioner's request to call those witnesses at a second trial. However, at the hearing Mr. Withington revised his prior testimony by stating that in June 1975 he would have predicted the computer equipment in issue to have a residual value of between $ 3,550,193 and $ 4,339,125, with a midpoint *113 of $ 3,944,659. As in Coleman I, Mr. Withington's residual value projection was the sum of the midpoint residual values of all items of computer equipment included in the transaction, plus or minus 10 percent. This is almost double the residual value which Mr. Withington projected at trial in Coleman I. This revised valuation was based on three changes. First, Mr. Withington valued IPC channels, TELEX/Calcom discs and tapes, and DRC memory equipment as components which worked with IBM 360 systems during Coleman I. Therefore, Mr. Withington projected that these components would have no residual value, consistent with his zero residual value projection for IBM 360 systems. After trial, Mr. Withington learned that Mr. Hartmann's sources, to which Mr. Withington did not have access, positively identified the components as IBM system 370 equipment. Consequently, Mr. Withington revised his projection by stating that the components would have a residual value of 10 to 20 percent of their 1975 value, consistent with his projection for IBM 370 systems. Second, Mr. Withington determined that the IBM system 360, 360 memory, and IBM disc and tape equipment should have been assigned a *114 scrap value (for gold, etc.) of between 0.5 percent and 1.0 percent rather than no scrap value. Mr. Withington gave no opinion on scrap value during Coleman I. Finally, Mr. Withington changed his opinion regarding the appropriate list price for IPC channel equipment, for purposes of determining the residual value of the IPC channels, from $ 31,990 per unit to $ 71,539 per unit. Originally, Mr. Withington had based his valuation of the IPC channels on a published list price. He revised his opinion to use figures supplied by Mr. Hartmann in Coleman I, as Mr. Hartmann had access to original documents of the seller which identified the equipment. We viewed as generally reasonable Mr. Withington's reasons for revising his projection of residual value. At the same time, we agree with petitioners that Mr. Withington's revisions tend to weaken his testimony. Nonetheless, after review of the hearing testimony, documentary evidence, and of the transcript of the trial in Coleman I, we found that the residual value opinion Mr. Withington gave at the evidentiary hearing was still less than the amount of the balloon payment due in June 1983. Accordingly, we notified the parties in our Order *115 dated December 19, 1989, that a second trial on the merits would be unnecessary because such a trial would amount merely to a second de novo review of the same facts and issues by a new trial judge. [2]
We adopt the findings of fact found in Coleman I and Coleman I-A insofar as such findings pertain to petitioners in this case. Those findings are incorporated by this reference. For convenience and clarity, we briefly summarize them here. Petitioner was a partner in Bari. On June 30, 1975, Bari agreed to purchase computer equipment from CIG Computer Products, Inc. (CIG Products) for $ 25,000,000. Bari paid $ 1,900,000 cash down and gave CIG Products a nonrecourse promissory note for the remaining $ 23,100,000. The note was to be paid in 96 monthly payments with a final $ 6,500,000 balloon payment due *116 on June 30, 1983. Under the terms of the purchase agreement, Bari had no possessory rights in the computer equipment. The seller, CIG Products, remained responsible for all taxes in connection with the equipment, assumed all risk of damage, loss or destruction of the equipment, and could sublease or substitute the equipment for like-kind equipment without Bari's prior permission. In addition, Bari's interest in the equipment was subordinate to that of a prior creditor. Also on June 30, 1975, Bari agreed to lease the equipment back to CIG Products for 96 months. The lease payments were slightly more than the amount of the monthly payments due on the nonrecourse note. If Bari made all monthly payments on the nonrecourse note and CIG Products made all lease payments as required before making the balloon payment due in 1983, Bari would receive $ 50,240 more on the lease than it paid on the note. Thus, if the residual value of the computer equipment was equal to or less than the amount of the balloon payment, Bari's profit on its investment of $ 1,900,000 would be limited to the contractual profit from the lease, i.e., $ 50,240 over 8 years. OPINION
The critical date for *117 evaluation of the fair market value and projected residual value of the computer equipment at the end of the lease was June 30, 1975, in both the present case and in Coleman I. Experts for both parties testified that the $ 25,000,000 purchase price approximately equaled the fair market value of the computer equipment at the time of the transaction. Expert testimony on the residual value of the computer equipment at the end of the lease (June 1983) was sharply divided. However, residual value was critical to a determination of whether Bari acquired sufficient benefits and burdens of ownership in Coleman I. We concluded that in June 1975, a competent expert would have projected the residual value in 1983 to be less than the balloon payment due in June 1983 by several million dollars. Despite considerable effort, petitioners have not convinced us that the facts regarding the residual value of the computer equipment in this case are so materially different from those in Coleman I and Coleman I-A that our decision in those cases should not be controlling. Assuming we accepted the revised residual value to which Mr. Withington's testified at the evidentiary hearing rather than that *118 to which he testified in Coleman I, we would still conclude that the 1983 residual value was equal to the midpoint of Mr. Withington's revised range, or $ 3,944,659. That figure is more than $ 2,500,000 less than the amount of the balloon payment. Moreover, even if we rejected Mr. Withington's testimony entirely and accepted only Mr. Hartmann's testimony instead, the residual value is significantly less than the amount of the balloon payment. Mr. Hartmann projected a residual value ranging from $ 2,467,000 to $ 8,580,000). The midpoint of that range, $ 5,523,300, is approximately $ 1 million less than the amount of the balloon payment. In Coleman I, we listed several factors which are relevant to a determination of whether ownership has transferred in a purported sale/leaseback situation. [3] We focused primarily on whether, given the significant amount of nonrecourse debt used to finance the transaction, a reasonable possibility existed that Bari could recoup its investment from the income-producing potential and residual value of the computer equipment at termination of the leaseback to CIG Products. Coleman v. Commissioner, T. C. Memo. 1987-195, 56 P-H Memo T.C. par. 87,195,53 T.C.M. 598. *119 *120 We adopt and reaffirm our reasoning in Coleman I and Coleman I-A. The circumstances of the transaction reveal that Bari had no reasonable expectation of recouping its investment outside of the $ 50,240 contractually limited profit return Bari could obtain under the lease if CIG Products made all lease payments. Even the residual values projected by petitioners' own expert would lead to the conclusion that at the time Bari entered into the purported sale/leaseback with CIG Products, the residual value of the equipment would not have exceeded the amount of the balloon payment. See also Coleman v. Commissioner (Coleman I-A), T.C. Memo. 1989-248, 58 P-H Memo T.C. par. 87,248 at 1213-1214, 57 T.C.M. 493, 495. Given this fact, it would not have been economically prudent to make the balloon payment as the small, but guaranteed, $ 50,240 profit on the lease would then be lost. Accordingly, Bari would not reasonably have had a realistic opportunity for profit on the equipment. Bari would have expected to default on the balloon payment and let CIG foreclose on the computer equipment. This is exactly what happened. Therefore, as we stated in Coleman I: the foreseeable *121 course of this transaction was that Bari would pay CIG a lump sum of $ 1,900,000 in exchange for fixed payments over eight years of $ 1,950,240. Bari's profit on the transaction (other than tax benefits) would result solely from the fixed payments contractually agreed to by the parties and would bear no relation to either the residual value or income-producing potential of the property. At no time during or after the term of the lease was Bari to have any possessory rights with respect to the equipment. Accordingly, Bari's position in this transaction is indistinguishable from that of a financier. Bari's potential for profit was capped by the amount contractually agreed to by the parties and Bari's risk of not receiving such profit hinged solely on CIG's ability and willingness to make required payments * * * . * * * the profit potential and the risk of Bari's investment had no relation to the underlying equipment * * * [Coleman v. Commissioner, supra, 56 P-H Memo T.C. par. 87,195 at 947, 53 T.C.M. 598, 606.] Further, we reaffirm our conclusion that discussion of other factors sometimes considered in determining ownership for tax purposes would not result in the *122 transaction being cast in a different light. CIG Products, not Bari, bore the risk of loss or damage to the equipment, was responsible for any taxes due on the equipment, and could sublease or substitute the equipment without approval. Consequently, Bari never acquired sufficient benefits and burdens of ownership to become the owner of the computer equipment for Federal tax purposes. Torres v. Commissioner, 88 T.C. 702, 720-727 (1987); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1243 (1981). For that reason, we held in Coleman I that petitioner was not entitled to deductions in 1976 based on Bari's purported ownership. For the same reason, petitioners are not entitled to claim a partnership loss in 1975, or any other year, arising out of the deductions Bari claimed in connection with its purported ownership of the computer equipment. Our conclusion that Bari did not acquire ownership of the computer equipment is sufficient in itself to sustain respondent's determination of deficiency. Since the ownership issue is fully dispositive, it was not necessary to, and we did not, reach the other issues in Coleman I. However, in *123 the present case respondent also determined that petitioners should be liable for the increased rate of interest on a substantial underpayment attributable to a tax-motivated transaction set forth in section 6621(c). The increased interest of section 6621(c) was not in issue in Coleman I. Because the substantive issue of whether the purported sale/leaseback otherwise had economic substance determines the increased rate of interest issue, we address economic substance here. If a party does not become the owner of property after a purported purchase, the transaction in issue does not take the form of a sale. The fact that a sale did not occur and Bari did not become the owner of the computer equipment for Federal tax purposes does not, ipso facto, mandate that we find the Bari transaction devoid of economic substance and disregard the sale/leaseback as a sham. Grodt & McKay Realty, Inc., supra at 1243, citing Estate of Franklin, 64 T.C. 752 (1975), affd. on different grounds 544 F.2d 1045 (9th Cir. 1976) (purported sales were not sales but options). *124 However, recognition for tax purposes requires that the transaction have economic substance and be "imbued with tax independent considerations." Frank Lyon Co. v. United States, 435 U.S. 561, 584 (1978). Three factors lead us to conclude that the transaction in issue was devoid of economic substance. First, Bari's potential economic profit on the transaction rested solely on fixed contractual lease payments of $ 50,240 over 8 years. Bari had no reasonable opportunity of a potential profit on the computer equipment itself because the residual value of the equipment at the end of the lease term was less than the amount of nonrecourse debt still owed. Rice's Toyota World, Inc, v. Commissioner, 752 F.2d 89, 94-95 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983). Second, Bari's use of nonrecourse financing would facilitate abandonment of the transaction. Rice's Toyota World, Inc. v. Commissioner, supra at 95. Abandonment would be economically prudent where, as here, the amount still owed on nonrecourse *125 debt exceeds the residual value of the property. Bari did in fact default, never making the $ 6,500,000 balloon payment. Finally, and most critically, Bari's use of nonrecourse financing and the fact that Bari had no reasonable possibility of economic profit on the equipment leads us to conclude that Bari's real expectations of profit from the transaction rested on hoped-for tax benefits. On these facts, this transaction is remarkably similar to the computer sale/leaseback found to be devoid of economic substance, i.e., a sham, in Rice's Toyota World, Inc. v. Commissioner, supra. Thus, the purported sale/leaseback is devoid of economic substance and will not be recognized for tax purposes. Rice's Toyota World, Inc. v. Commissioner, supra at 95; Grodt & McKay Realty, Inc., supra at 1244-1246. Section 6621 (c) imposes an interest rate of 120 percent of the adjusted rate of interest established by section 6621 on substantial underpayments attributable to tax-motivated transactions. A substantial underpayment attributable to a tax-motivated *126 transaction is any underpayment for a taxable year attributable to one or more tax-motivated transactions, if such underpayment exceeds $ 1,000. Sec. 6621(c)(2). The increased rate applies to interest accruing after December 31, 1984, even though, as here, the transaction was entered into prior to the date of enactment of section 6621(c). DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), affd. 862 F.2d 400 (2d Cir. 1988); Solwiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). By definition, any sham or fraudulent transaction is a tax-motivated transaction subject to the increased rate of interest. Sec. 6621(c)(3)(A)(v). It is well established that transactions which are devoid of economic substance or lack business purpose are sham transactions within the meaning of section 6621(c)(3)(A)(v). Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F. 2d 186 (4th Cir. 1988), *127 affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); McCrary v. Commissioner, 92 T.C. 827, 857 (1989). We concluded that the purported computer equipment sale/leaseback transaction in issue was devoid of economic substance from inception. Thus, the transaction was a sham according to section 6621(c)(3)(A)(v), and petitioners' underpayment, substantially greater than $ 1,000, was attributable to a tax-motivated transaction. Accordingly, we sustain respondent's determination of the increased rate of interest under section 6621(c). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Section 6621(d) was amended and redesignated as section 6621(c) by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(d), 100 Stat. 2744. For convenience, we refer to section 6621(c)↩ in this opinion.
2. We also note that in the Order of December 19, 1989, we denied petitioners' motion for Order Directing Respondent to Show Cause why the residual value of the IBM 370-135 equipment in this case is not governed by Estate of Thomas v. Commissioner, 84 T.C. 412 (1985), because there is no testimony showing the equipment in Estate of Thomas↩ to be similar.
3. Those factors include: (1) whether useful life in excess of the leaseback term and significant residual value are reasonably expected to exist; (2) whether the parties treated the transaction as a sale; (3) whether legal title passed; (4) whether the contract of sale creates a present obligation on the purchaser to make payments; (5) whether any other party holds a purchase option at less than fair market value; (6) whether renewal rental at the end of the leaseback term is set at fair market rent; and (7) whether the purported owner of the property had a reasonable possibility to recoup his investment in the property from the income-producing potential and residual value of the property. Coleman v. Commissioner, T. C. Memo. 1987-195, 56 P-H Memo T.C. par. 87,195, at 943, 53 T.C.M. 598, 603 (citing Torres v. Commissioner, 88 T.C. 702, 721 (1987); Mukerji v. Commissioner, 87 T.C. 926 (1986); Estate of Thomas v. Commissioner, 84 T.C. 412 (1985)). Also pertinent is which party pays the property taxes, which party bears the risk of loss or damage to the property, and whether the purchaser has vested possessory rights. Cooper v. Commissioner, 88 T.C. 84, 104 (1987); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238↩ (1981).