DELBERT W. COLEMAN AND KAREN A. GRAHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coleman v. Commissioner
Docket No. 48659-86
United States Tax Court
T.C. Memo 1990-509; 1990 Tax Ct. Memo LEXIS 562; 60 T.C.M. (CCH) 874; T.C.M. (RIA) 90509; September 25, 1990, Filed *562 Held: Petitioners' motion to reconsider is denied. Our decision in Coleman v. Commissioner, T.C. Memo. 1987-195, is controlling on all issues which that case resolved pertaining to the alleged computer sale/leaseback transaction between Bari Associates and CIG Products, Inc. Held further: The language of our opinion is amended to the extent necessary to correct for a computational error carried over when we adopted and incorporated the findings of fact in Coleman v. Commissioner, T.C. Memo. 1987-195. Henry G. Zapruder, David J. Fischer, and Roger A. Pies, for the petitioners. Michael D. Wilder, for the respondent. WHITAKER, Judge. WHITAKER
SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION By timely statutory notice respondent determined a deficiency in petitioners' 1975 Federal income tax of $ 184,226 and the increased rate of interest on a substantial underpayment attributable to a tax-motivated transaction under section 6621(c)(1). [1] This case is presently before us on petitioners' Motion for Reconsideration of our opinion in Coleman v. Commissioner, T.C. Memo. 1990-99 (Coleman II). Petitioners filed their motion under Rule 162, which provides for the filing of a motion *563 to vacate or revise a decision which has been entered. However, because entry of the decision in Coleman II awaits submission of computations under Rule 155, we deem the motion to have been filed under Rule 161. In addition, we note that our earlier opinion in Coleman v. Commissioner, T.C. Memo. 1987-195 (Coleman I) contained a computational error. [2] *564 That error was carried over when we adopted and incorporated the facts of Coleman I into our opinion in Coleman II. The language of our opinion shall be amended to the extent necessary to replace the figure $ 50,240 with the figure $ 32,240 wherever such figure appears. The effect of such correction, if any, is to reinforce our holding sustaining respondent's determination of deficiency. FINDINGS OF FACT Petitioner's motion places before us the residual value of computer equipment involved in a purported sale/leaseback transaction between Bari Associates (Bari) and CIG Products, Inc. (CIG Products). The facts pertaining to that transaction are set forth in detail in Coleman I, Coleman v. Commissioner, T.C. Memo. 1989-248 (Coleman I-A), and Coleman II. For convenience, we briefly summarize the facts here. In June 1975, Bari agreed to purchase computer equipment from CIG Products for $ 25,000,000 and immediately to lease that equipment back to the seller. Petitioner, Delbert Coleman, was one of Bari's partners. Bari paid $ 1,900,000 cash down and gave CIG Products a nonrecourse promissory note for the remaining $ 23,100,000. The note was to be paid in 96 monthly payments with a balloon principal payment of $ 6,500,000 due at termination of the *565 lease on June 30, 1983. If Bari and CIG Products made all payments under the note and lease, respectively, Bari would have a net cash flow on the lease of $ 1,932,240, not taking into account the cash down payment or any payment on the final $ 6,500,000 balloon payment. CIG Products was required to pay all expenses pertaining to the lease or the equipment, including taxes. Bari retained CIG Products to broker sales or releases of the equipment after termination of the lease in return for a fee of the lesser of 50 percent of net proceeds or 125 percent of expenses. Bari claimed deductions attributable to the transaction amounting to $ 7,462,564 in 1975. This is the fourth opinion pertaining to the Bari transaction. In Coleman I, we denied deductions attributable to the Bari equipment claimed by Mr. Coleman in 1976. We found the purchase price approximated the fair market value of the Bari equipment in June 1975. However, applying seven factors, we held that Bari did not become the owner of the computer equipment for Federal tax purposes. Coleman I, 56 P-H Memo T.C. par. 87,195 at 938, 943, 53 T.C.M. 598, 603. Critical to that holding was our determination that in June 1975 a *566 competent expert would not have predicted that the equipment would have a residual value in June 1983 which equaled or exceeded the $ 6,500,000 balloon payment due at that time. Coleman I, 56 P-H Memo T.C. par. 87,195 at 938, 947, 53 T.C.M. 598, 606. Therefore, Bari would not have expected to recoup its investment and economic prudence would have led Bari to expect to default on the nonrecourse loan when the balloon payment came due. Bari did in fact default on the $ 6,500,000 balloon payment. We concluded that Bari's position was indistinguishable from that of a financier. Bari's expectations of profit stemmed solely from the $ 32,240 guaranteed over the 8 years of its lease to CIG Products rather than relating to the value or income-producing potential of the computer equipment. Coleman I, 56 P-H Memo T.C. par. 87,195 at 938, 947, 53 T.C.M. 598, 606. The computer equipment in the Bari portfolio consisted of IBM systems 360, 370-135, and 370-155 central processing units, compatible components, and peripheral units manufactured by IBM and by other manufacturers. We relied on the testimony of respondent's expert, Frederic G. Withington, in determining the residual value of the Bari *567 equipment. Mr. Withington testified that in June 1975 he would have predicted an aggregate residual value in June 1983 of $ 1,892,093 to $ 2,292,093. Mr. Withington further stated that the midpoint of that range was the most likely value, but that his projection contained an uncertainty factor of 10 percent. In contrast, petitioners' expert, Svend Hartmann, testified that in 1975 he would have predicted that the residual value of the Bari equipment in 1983 would be somewhere in the range of $ 2,467,000 to $ 8,580,000. Mr. Hartmann could not say whether any value within that range was more probable. We found Mr. Withington's methodology the more reliable. Mr. Withington's projections were based upon residual value forecasts which he had made close to time of the Bari transaction. In addition, we found that an investor would not have found Mr. Hartmann's advice useful because of the breadth of his projected range and his inability to designate more probable values within that range. Coleman I, 56 P-H Memo T.C. par. 87,195 at 938, 945-947, 53 T.C.M. 598, 606. Subsequent to our opinion in Coleman I, petitioners filed a motion to reopen the record or to hold an evidentiary hearing. *568 Petitioners asserted that Mr. Withington had failed to produce all documents called for in a subpoena duces tecum and offered into evidence a letter (the Levin letter) written by Mr. Withington in 1973. According to petitioners, the Levin letter refuted Mr. Withington's trial testimony on the residual value of IBM 360 and 370-135 equipment. We considered and denied petitioners' motion in Coleman I-A. We concluded that the Levin letter was consistent with Mr. Withington's testimony in Coleman I and, to the extent it may have been material, the letter was merely cumulative of other similar evidence introduced at trial. Coleman I-A, 58 P-H Memo T.C. par. 89,248, 57 T.C.M. 493, 495. By Order dated May 22, 1989, we directed petitioners to show cause why Coleman I and Coleman I-A should not control the outcome of Coleman II. In their response, petitioners argued that they had discovered additional discrediting documents prepared by Mr. Withington which were not produced pursuant to the subpoena in Coleman I. Petitioners asked that we reject Mr. Withington's Coleman I testimony and that we allow Mr. Hartmann and a new expert, Mr. Esmond C. Lyons, Jr., to testify at trial in Coleman *569 II. Because of our concern regarding Mr. Withington's response to the subpoena in Coleman I, we granted petitioners' request to hold an evidentiary hearing, the result of which is the subject of Coleman II. The sole purpose of that hearing was to examine Mr. Withington with respect to residual value of the Bari computer equipment in light of the new documents proffered by petitioners. By Order dated July 31, 1989, we informed petitioners that if testimony and documents introduced at the hearing did not reveal facts which were materially different from the facts found in Coleman I, a second trial before a different trial judge was not justified. At the hearing we admitted the documents offered into evidence by petitioners. However, we found that the documents which Mr. Withington failed to produce in Coleman I were either cumulative, redundant, or not relevant to the residual value of the Bari equipment. Coleman II, 59 P-H Memo T.C. par. 90,099 at 449, 451-452, 58 T.C.M. 1525, 1528. In addition, Mr. Withington revised his residual value projection upward to a value of between $ 3,550,193 and $ 4,339,125, with the midpoint of that range more probable. [3] *571 However, other than with respect *570 to scrap value, Mr. Withington did not revise his residual value projections for Bari's IBM 360, 370-135, 370-155, and related equipment. Mr. Withington made no revisions based upon the documents which petitioners introduced at the hearing. Although we agreed that Mr. Withington's revisions tended to weaken his original testimony, we found Mr. Withington's reasons for revising his projection of aggregate residual value reasonable. Petitioners failed to persuade us that the facts regarding residual value were so materially different from the facts in Coleman I that our decision in that case should not be controlling. After consideration of the record in both Coleman I and Coleman II, we remained convinced that Bari could not reasonably have expected the residual value of the Bari equipment in 1983 to equal or exceed the balloon payment due in that year. Therefore, we determined that a second trial on residual value was not justified. Coleman II, 59 P-H Memo T.C. par. 90,099 at 449, 451, 58 T.C.M. 1525, 1528. We adopted and incorporated the findings of fact from Coleman I and Coleman I-A. After consideration of those findings on residual value and other pertinent factors, we reaffirmed our holding that Bari was not the owner of the computer equipment for Federal tax purposes. Therefore, *572 we denied deductions attributable to the Bari transaction which petitioners claimed in 1975. Coleman II, 59 P-H Memo T.C. par. 90,099 at 453, 58 T.C.M. 1525, 1528-1529. Because our holding on the issue of whether Bari had the benefits and burdens of ownership was determinative, we did not reach respondent's economic substance argument in Coleman I. However, unlike Coleman I, the increased rate of interest on a substantial underpayment attributable to a tax-motivated transaction, as set forth in section 6621(c), was in issue in Coleman II. We discussed the issue of economic substance because a transaction which lacks economic substance is a tax-motivated transaction within the meaning of section 6621(c). See McCrary v. Commissioner, 92 T.C. 827, 857 (1989). We concluded that the Bari transaction lacked economic substance. Three factors led to that conclusion. The residual value of the computer equipment at the end of the lease term was less than the amount Bari still owed on the nonrecourse loan. Bari's use of nonrecourse financing facilitated abandonment of the transaction. Finally, Bari's use of nonrecourse financing and the fact that Bari had no reasonable possibility of *573 economic profit on the equipment led us to conclude that Bari's real expectations of profit from the transaction rested on hoped-for tax benefits. Coleman II, 59 P-H Memo T.C. par. 90,099 at 449, 454, 58 T.C.M. 1525, 1530. Accordingly, we held that petitioners' underpayment was attributable to a tax-motivated transaction and that petitioners were liable for the increased rate of interest set forth in section 6621(c). By Order dated December 19, 1989, we denied petitioners' request to call Mr. Hartmann and Mr. Lyons to give additional testimony on residual value at a second trial. We determined that Mr. Hartmann's and Mr. Lyons' testimony would have been needlessly cumulative in light of our opinion in Coleman II. We also denied petitioner's motion for an order directing respondent to show cause why the residual value of the Bari IBM 370 equipment, with respect to the IBM 370-135 equipment, was not governed by Estate of Thomas v. Commissioner, 84 T.C. 412 (1985) (Estate of Thomas). We concluded that the type of IBM 370 equipment in issue in Estate of Thomas differed from the Bari equipment. OPINION Petitioners seek reconsideration of several different aspects of our opinion. Petitioners' *574 arguments often overlap because the focus of each argument is ultimately an objection to our determination that the June 1983 residual value of the Bari equipment could not reasonably have been expected to equal or exceed $ 6,500,000. We have attempted to separate the principal objections and address each separately. We find that none of petitioners' arguments persuade us that we should grant their motion for reconsideration. 1. Residual Value of Bari's IBM 370 Equipment
Petitioners contest our conclusion that the residual value of Bari's IBM 370 equipment (excluding 370-155 equipment) is not governed by the residual value found for computer equipment in Estate of Thomas. Petitioners objection is twofold. First, petitioners maintain that the equipment and time period in issue in Estate of Thomas are essentially the same as those involved in the Bari transaction. Second, petitioners claim that we rejected Mr. Withington's testimony in Estate of Thomas and relied upon the testimony of Mr. Hartmann and Mr. Lyons. According to petitioners' reading of Estate of Thomas, we then found that IBM 370 models similar to those in the Bari portfolio had a residual value of 20 to 30 percent *575 in 1982 and 1983. Petitioners argue that the doctrine of collateral estoppel should therefore be applied to preclude respondent from denying a 1983 residual value of 20 to 30 percent for Bari's IBM 370 and related equipment. Petitioners argue that such a residual value would show that a possibility for profit existed in the Bari transaction. We disagree with all of petitioners' contentions. In Estate of Thomas, a partnership purchased computer equipment from IBM with cash and a large nonrecourse purchase money loan. The partnership then leased the equipment to unrelated third parties. The Estate of Thomas partnership acquired and entered into several leases of its computer equipment in August 1975. Those leases expired at various times in 1982 and 1983. In August 1975, executives of the Estate of Thomas partnership were familiar with computer equipment, computer leasing transactions, and current residual value projections for the type of equipment involved. Those executives expected in 1975 a minimum residual value range of 15 to 20 percent for the equipment and believed that residual values of as high as 30 percent were reasonable. However, at trial the parties stipulated *576 that the aggregate residual value of the equipment would be at least 14 percent of the overall expected cost of the equipment. Estate of Thomas v. Commissioner, supra at 429. Equipment in the Estate of Thomas portfolio included IBM system 360, 370-145, 370-155, and 370-168 processors and related components and peripheral equipment. No IBM 370-135 equipment was included in the Estate of Thomas portfolio. We held that the Estate of Thomas partnership had the benefits and burdens of ownership of the subject computer equipment despite contracting away significant risks in lease agreements. We also determined that the lease transactions in Estate of Thomas had economic substance. Critical to those holdings was our determination that the Estate of Thomas partnership had a reasonable expectation that the residual value of the acquired computer equipment would be sufficient to enable the partnership to break even or achieve a profit on the equipment by the end of the lease terms. Estate of Thomas v. Commissioner, supra at 439. The record contained the testimony of Mr. Withington, who projected residual values of between 9 and 18 percent, and that of Mr. Hartmann and Mr. Lyons, who projected *577 residual values of between 20 and 30 percent by 1982 or 1983. We found that the testimony of all experts supported a determination that in 1975 the Estate of Thomas partnership reasonably could have expected a residual value of at least 14 percent. Computations showed that at residual values of 14 and 20 percent, the Estate of Thomas partnership would have made a profit on its leasing transactions. Estate of Thomas v. Commissioner, supra at 428-429. Petitioners in this case attempt to invoke collateral estoppel against respondent. See United States v. Mendoza, 464 U.S. 154, 159 n.4 (1984). "Collateral estoppel generally prevents parties and their privies from relitigating issues previously decided by a court of competent jurisdiction relating to a different tax year, or involving a new cause of action." Calcutt v. Commissioner, 91 T.C. 14, 21 (1988) (citing Gammill v. Commissioner, 62 T.C. 607, 613 (1974)). This Court recognizes five conditions which must be met in order to apply collateral estoppel against a party. Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990). Those conditions are: (1) The issue in the second suit must be identical in *578 all respects with the issue decided in the first suit; (2) there must be a final judgment rendered by a court of competent jurisdiction; (3) collateral estoppel may be invoked against parties to the first suit or their privies to the prior judgment; (4) the parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision; and (5) the controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. Commissioner v. Sunnen, 333 U.S. 591, 599-600 (1948); Peck v. Commissioner, supra at 166-167. Petitioners have failed to show that all five conditions for application of collateral estoppel have been met. Specifically, petitioners have shown neither that the issue with respect to the residual value of the Estate of Thomas equipment and the issue with respect to the residual value of the Bari equipment are identical in all respects, nor that controlling facts pertaining to the residual value of the IBM 370 equipment in the Bari portfolio (excluding 370-155 equipment) remain unchanged from facts found in Estate of Thomas. Other than the IBM 370-155 equipment, which petitioners have not *579 included in their collateral estoppel argument, the IBM 370 equipment in the Bari portfolio consisted solely of IBM 370-135 equipment. In Estate of Thomas we were concerned with the residual value of IBM 370-145, 370-155, and 370-168 equipment. Since we considered residual values of different equipment in the two cases, the factual issues pertaining to residual values were not identical and controlling facts with respect to residual value were also different. We reject petitioners' argument that Mr. Withington's partial reliance on a May 1975 report concerning IBM 370-145 equipment when projecting the residual values of the IBM 370-145 equipment in Estate of Thomas and of Bari's IBM 370-135 equipment shows that the equipment in both cases are essentially identical. [4] *580 Such an argument goes to impeachment of Mr. Withington's methodology, as discussed below, rather than to the elements of collateral estoppel. For the foregoing reasons, collateral estoppel does not apply to compel a conclusion that the residual value of Bari's IBM 370 and related equipment is governed by the residual value found in Estate of Thomas. Furthermore, assuming arguendo that petitioners showed all five conditions for application of collateral estoppel had been met, we would not agree that the resulting residual value would justify a determination that Bari had a possibility of recouping its investment or profiting on the transaction. First, petitioners misread Estate of Thomas when they claim that we found the residual value of the Estate of Thomas IBM 370 equipment to be 20 to 30 percent. Although we remarked that a reasonable potential for expecting residual values of 20 to 30 percent may have existed, we found that the residual value of the equipment in the Estate of Thomas portfolio was equal to the residual value stipulated by the parties, i.e., at least 14 percent. Estate of Thomas v. Commissioner, 84 T.C. at 428, 433. *581 Further, computations show that at residual values consistent with a residual value of at least 14 percent, as found in Estate of Thomas, no possibility existed that Bari could profit on its transaction with CIG Products. Even assuming a residual value of 25 percent, a figure within the maximumn residual value range projected by experts testifying in Estate of Thomas , Bari could not have profited on the transaction. See Appendix. 2. Reliance upon Mr. Withington's Residual Value Testimony
Petitioners contest our reliance on Mr. Withington's residual value testimony in determining the residual value of the Bari equipment. Again, petitioners' objection is multi-faceted. First, petitioners maintain that we rejected Mr. Withington's testimony in Estate of Thomas and, therefore, should do so here. As noted earlier, Mr. Withington partially relied upon the May 1975 report in both Estate of Thomas and Coleman I. The report incorporated an assumption that IBM would continue with a plan, called "Future System" (FS), to introduce a new generation of computers. Introduction of such computers would have increased the rate of obsolescence of IBM's 370 computers and reduced the residual *582 value of such equipment. Because of his use of the May 1975 report, petitioners claim that we rejected Mr. Withington's testimony in Estate of Thomas. Petitioners cite to the Court's statement in Estate of Thomas that "by May 1975 many in the field believed that IBM was going to cancel the FS program, and this knowledge had a buoying effect on the residual value predictions of many experts at the time." Estate of Thomas v. Commissioner, 84 T.C. at 427. However, that statement did not constitute rejection of Mr. Withington's residual value testimony. Indeed, we stated: we do not view [Mr. Withington's] testimony as inconsistent with our finding but instead attribute the discrepancy to the fact that the report may have been prepared prior to the dissemination of rumors about IBM's abandonment of the FS program or to Mr. Withington's more conservative approach. [Estate of Thomas v. Commissioner, 84 T.C. at 427 n.19.] We note that Mr. Withington's residual value projection of 9 to 17 percent in Estate of Thomas corresponded with the residual value stipulated by the parties. Intertwined with the argument discussed above, petitioners reiterate their contention that in other respects Mr. *583 Withington's testimony at the evidentiary hearing discredited his testimony in Coleman I. When we adopted and incorporated the factual findings of Coleman I, we, implicitly if not explicitly, reaffirmed our determination that Mr. Withington's residual value testimony in that case remained more reliable and useful than Mr. Hartmann's residual value projection. [5]
When considering expert testimony on residual value, we bear in mind that "In determining the residual value of the equipment, it is important to note that a business cannot operate on the basis of hindsight." Levy v. Commissioner, 91 T.C. 838, 858 (1988). We must base our analysis upon "the status of the economy and market conditions of the computer industry at the time the transaction was consummated." Levy v. Commissioner, supra at 858. Thus, we found highly persuasive the fact that Mr. Withington's predictions were based upon residual value forecasts prepared by him from information available in the market around the time of June 1975. Mr. Withington prepared the original *584 residual value projections after consideration of IBM's probable future successor products, future functional requirements of computer users, and the future of current computer technology. Mr. Withington relied on his contemporaneously prepared reports to determine a 1983 residual value for each type of equipment in the Bari portfolio. Those residual values were a projected percent of the purchase price, with a range of uncertainty unique to each type of equipment. Mr. Withington then calculated the aggregate residual value by summing the midpoints of his ranges for each type of equipment and allowing an aggregate range of uncertainty of plus or minus 10 percent. In contrast, Mr. Hartmann's opinion was not predicated upon contemporaneous market information. Mr. Hartmann extrapolated residual value using a three-step method. First, Mr. Hartmann estimated the remaining economic useful life of the types of equipment in the Bari portfolio as of 1975. Second, Mr. Hartmann drew straight-line approximations of declining residual value curves for each type of equipment. The curves started with residual values of 100 percent in June 1975, declining to a zero residual value at the end of *585 the estimated useful life. Mr. Hartmann then projected a range of residual value for the Bari equipment from the straight-line approximations which resulted from aggregation of the approximated straight-line rates of decline for each type of equipment. Mr. Hartmann could not adequately explain why his straight-line approximation should predict residual values as accurately as residual value curves prepared using information available in 1975. Coleman I, 56 P-H Memo T.C. par. 87,195 at 946, 53 T.C.M. at 606. After a review of the records in Coleman I and Coleman II with particular emphasis on Mr. Withington's post-trial upward revisions, we adhere to our determination that Mr. Withington's methodology and results were more reliable with respect to residual value than that of Mr. Hartmann. Mr. Withington did not apply his methodology to his revisions in Coleman II. However, we found the reasons for any upward revision in residual value reasonable. [6] In contrast to the requirement that our determination must be based upon contemporaneous information, Mr. Hartmann stated at trial in Coleman I that his residual value predictions might have been different in several respects had they *586 been based on reports prepared in 1975, as were Mr. Withington's. Moreover, we remain convinced that Mr. Hartmann's residual value projection of between $ 2,467,000 and $ 8,580,000 would have had minimal usefulness to an investor in 1975 because of its broad range in relation to an investment of $ 1,900,000. Indeed, Mr. Hartmann testified *587 that his range would likely have been narrower if based upon residual value range projections prepared close to the time of the Bari transaction in June 1975. We recognize that uncertainty and volatility in projecting future residual values often limits expert opinions to ranges of values, as asserted by petitioners. See, e.g., B & A Distributing Co. v. Commissioner, T.C. Memo. 1988-589. However, such uncertainty does not automatically indicate that a broad range is more useful to an investor than a narrow range when analyzing the prospects of profitability of a transaction. As we stated: The utility of this prediction is further discredited by Hartmann's testimony that he could not say whether any particular value within this range was more likely to occur than any other value within the range. [Coleman I, 56 P-H Memo T.C. par. 87,195 at 938, 947, 53 T.C.M. 598, 606.] 3. Standard for Evaluation of Residual Value Testimony
Approaching our residual value determination from yet another angle, petitioners claim that we improperly looked to the midpoint of Mr. Withington's and Mr. Hartmann's residual value ranges rather than to the maximum of such ranges when determining if the Bari *588 transaction should be recognized for Federal tax purposes. [7] In addition, petitioners contend that references to the midpoint of a projected range of residual values, in effect, articulate an inappropriate bright line for determinations of residual values. We disagree. Petitioner's arguments concern the following statement: Assuming we accepted the revised residual value to which Mr. Withington testified at the evidentiary hearing rather than that to which he testified in Coleman I, we would still conclude that the 1983 residual value was equal to the midpoint of Mr. Withington's revised range, or $ 3,944,659. * * * Moreover, even if we rejected Mr. Withington's testimony entirely and accepted only Mr. Hartmann's testimony instead, the residual value is significantly less than the amount of the balloon payment. *589 Mr. Hartmann projected a residual value ranging from $ 2,467,000 to $ 8,580,000. The midpoint of that range, $ 5,523,300, is approximately $ 1 million less than the amount of the balloon payment. [Coleman II, 59 P-H Memo T.C. par. 90,099 at 449, 452, 58 T.C.M. 1525, 1528.] According to petitioners, it is improper for this Court to find that the residual value which could reasonably have been expected upon entering into a computer leasing transaction is equal to any specific value, particularly the midpoint of a range. Petitioners' arguments on brief assume that we equated the midpoint of projected residual value ranges with thatR B residual value which could reasonably have been expected. We disagree that we articulated such a "midpoint test" and with petitioners' contention that we must not determine specific residual values, as opposed to residual value ranges. Initially, petitioners fail to recognize that in Coleman I we did not find that the residual value of the Bari equipment was equal to the midpoint of ranges projected by either Mr. Withington or Mr. Hartmann. The sole issue in Coleman II was whether petitioners could show that there had been such a material change *590 in the facts as to residual value from those found in Coleman I that our decision in Coleman I should not be controlling. Petitioners failed to satisfy that burden. We incorporated the factual findings of Coleman I and followed our decision in Coleman I that Bari could reasonably have expected the 1983 residual value of the Bari equipment to be within the range of residual values projected by Mr. Withington. Further, we are under no obligation to accept the maximum of any expert's projected range of residual values. Inquiries into whether a purported computer sale/leaseback has economic purpose apart from tax benefits, or whether the benefits and burdens of ownership have passed to the purported investors, are inherently factual. Levy v. Commissioner, 91 T.C. at 854. Such determinations often turn upon what residual value could reasonably have been expected at the time the transaction was consummated. Levy v. Commissioner, supra at 858; Torres v. Commissioner, 88 T.C. 702, 721 (1987); Gefen v. Commissioner, 87 T.C. 1471, 1491 (1986); Mukerji v. Commissioner, 87 T.C. 926, 965 (1986); Estate of Thomas v. Commissioner, 84 T.C. 412, 428-430 (1985); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 205-206 (1983), *591 affd. in part 752 F.2d 89 (4th Cir. 1985). We rely upon expert testimony to determine what residual value could reasonably have been expected at the time the transaction was initiated. Levy v. Commissioner, supra; Torres v. Commissioner, supra; Gefen v. Commissioner, supra; Mukerji v. Commissioner, supra; Estate of Thomas v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, supra.In making that determination: the question is not who was correct in predicting the actual residual value of the computer equipment in 1984; rather, the question is what was reasonable to believe in 1977 with respect to what the residual value of the computer equipment would be in 1984. * * * [Gefen v. Commissioner, supra at 1491 n.10.] The opinions of all experts must be weighed in light of each expert's qualifications and all other relevant evidence of value. Johnson v. Commissioner, 85 T.C. 469, 477 (1985). However, if the parties fail to agree on residual value before trial we will not automatically find a residual value which lies in the middle of those projected by opposing experts, but may choose between experts. See, e.g., Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441 (1980). *592 On the other hand, a determination that the methodology and results of one expert are more reliable than those of an opposing expert does not require us to accept that expert's maximum projected residual value. See Coleman v. Commissioner, 87 T.C. 178, 210-213 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). Thus, we may find in a particular case that a reasonable expectation of residual value lies somewhere in the middle of ranges projected by the experts testifying if, notwithstanding general credibility, we find that the maxima of the ranges are unreliable or unsupported. Mr. Withington testified at trial and at the hearing in Coleman II that the midpoint of his projected residual value range was the most likely value. We found Mr. Withington's methodology more reliable with respect to residual value than Mr. Hartmann's. Our conclusion pertaining to methodology did not change after consideration of the record in Coleman II. In view of those facts, had we concluded we should accept a higher residual value for the Bari equipment than determined in Coleman I, the record would have supported a residual value equal to the midpoint of Mr. Withington's revised residual *593 value range. Moreover, even had we completely rejected Mr. Withington's residual value testimony and relied upon Mr. Hartmann's projection, the record would not support a determination that the residual value was equal to the maximum of the range projected by Mr. Hartmann. Again we emphasize that Mr. Hartmann's methodology was not based upon residual value information available at the time of the Bari transaction. Mr. Hartmann could not say whether any value within his $ 6,000,000 range was more likely. Moreover, Mr. Hartmann admitted that, had he used contemporaneously prepared residual value projections, his projected range would have been narrower. Upon such a record, we could not say that Bari could reasonably have expected a residual value equal to the maximum of Mr. Hartmann's residual value range. At most, the record would have justified a finding that Bari could reasonably have expected a residual value approaching the value in the middle of Mr. Hartmann's range. Thus, the language to which petitioners object refers to a residual value which, had we rejected Mr. Withington's testimony in Coleman I, we would have found to be reasonable and supported by the record. We *594 reject petitioners' proposition that we articulated a bright line standard which looks only to the midpoint of a range of projected residual value in such instances. Furthermore, relevant case law does not establish a rule requiring that we look only to the maximum of projected residual value ranges, or solely to ranges rather than specific residual values, when deciding whether a purported sale/leaseback transaction should be recognized for Federal tax purposes. Generalizing about evaluation of expert testimony on residual value may be difficult because the inquiry is factual and necessarily turns on the quantity and quality of evidence in any particular case. However, petitioners impute an unwarranted meaning to cases in which we did not determine a specific residual value or in which we looked to the maximum of a range of projected residual values. Often the record in a particular case reveals that the maxima of ranges of residual values expected by participants in computer leasing transactions are clearly supported or clearly unreasonable. In such cases, we are unwilling to perform an unnecessary determination of a particular residual value. Torres v. Commissioner, supra at 725. *595 Elsewhere, we have been presented with a record in which the parties have stipulated to a particular residual value or range of residual values. See, e.g., James v. Commissioner, 87 T.C. 905, 923 (1986), affd. 899 F.2d 905 (10th Cir. 1990) (expert testimony supported a stipulated residual value range of 0-35 percent, but there was no possibility of profit even at a 35 percent residual value); Estate of Thomas v. Commissioner, 84 T.C. 412 (1985) (finding a residual value equal to the stipulated residual value of at least 14 percent, rather than equal to the maximum of a range of 20 to 30 percent projected by the taxpayer's experts). Moreover, on occasion our determination is made upon a record containing expert testimony projecting specific residual values. For example, projections of residual value in a placement memorandum led investors to expect residual values of $ 15,000, $ 39,680, and $ 80,000, respectively, on investments in the three computer-leasing transactions in issue in Mukerji v. Commissioner, 87 T.C. 926 (1986). The placement memorandum projections were based upon current appraisals. Expert testimony in that case included the following projections: Withington
Lyons
Morgan
Mukerji investment
$ 18,500-$ 20,572
$ 35,000-$ 46,000
0
Hurchalla investment
71,845
30,000-  50,000
7,600
Thrall investment
65,476
50,000-  81,000
4,000
We *596 found Ms. Morgan's testimony less reliable than Mr. Withington's and Mr. Lyons' testimony, primarily because her opinion was not based upon contemporaneous residual value forecasts or market information. Mukerji v. Commissioner, supra at 965-967. However, we did not find that the taxpayers in Mukerji could reasonably have expected the maximum residual value contained in Mr. Lyons' range or a residual value equal to Mr. Withington's projection. Instead, we found that the expert testimony of Mr. Withington and Mr. Lyons supported specific residual values within the range of those set forth in the placement memorandum. Those specific residual values combined with supportable cash flow expectations led to our holding that opportunities for profit existed in the Mukerji transactions. Mukerji v. Commissioner, supra at 967. Thus, Mukerji is a case in which we utilized specific residual values, rather than ranges, in determining whether the subject transactions had economic substance. [8] *597 Petitioners contend that only broad ranges of residual value are reliable because of the uncertainty in estimating future values. We are under no obligation to accept broad ranges for residual values merely because of the inherent uncertainty in residual value forecasts. Other expert testimony which projects a narrower range or a specific value may contain greater indicia of reliability. In that respect, we further distinguish cases in which we have accepted broad ranges of residual value. See, e.g., Lansburgh v. Commissioner, T.C. Memo. 1987-491 (finding reliable expert testimony projecting a residual value of 5.3 to 33 percent, which supported expectations of a 9.3 percent residual value). Recitation of the facts surrounding our examination of residual value testimony in further computer sale/leaseback transaction cases would serve no useful purpose. We decline to accept petitioners' contention that we must look solely to the maximum residual value projections contained in a record. On the contrary, *598 in all cases we must make a determination as to what residual value could reasonably have been expected. See, e.g., Bussing v. Commissioner, 88 T.C. 449 (1987), reconsideration denied 89 T.C. 1050 (1987); Gefen v. Commissioner, 87 T.C. at 1471; Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 184; Emershaw v. Commissioner, T.C. Memo. 1990-246. 4. Additional Residual Value Testimony From Mr. Hartmann and Mr. Lyons
In order to impeach Mr. Withington's residual value testimony, petitioners make a proffer of additional residual value testimony by Mr. Hartmann. Petitioners also make a proffer of new testimony on residual value by Mr. Lyons. Mr. Hartmann's proffer is substantially similar to his testimony in Coleman I, with two major revisions. First, Mr. Hartmann incorporates Mr. Withington's revision with respect to scrap value. Second, Mr. Hartmann increases his residual value projection for IBM 360 plug-compatible memory equipment based upon a newly discovered document which Mr. Hartmann prepared in 1975. The net effect is to revise Mr. Hartmann's residual value projection upward. Mr. Lyons' proffer of testimony is substantially similar to that of Mr. Hartmann. It is inappropriate *599 to reopen the record to receive testimony which is merely cumulative or impeaching. Edgar v. Finley, 312 F.2d 533 (8th Cir. 1963). After such extensive consideration of the residual value of the Bari equipment by this Court, allowing petitioners to offer further evidence from Mr. Hartmann or cumulative evidence from Mr. Lyons would be affording petitioners "two bites at the apple." We admitted new documents and testimony at the hearing in Coleman II because of a concern which does not exist with respect to the proffered new testimony from Mr. Hartmann and Mr. Lyons. We were concerned that documents not produced pursuant to subpoena in Coleman I may have materially changed the record in petitioners' favor. That concern does not exist here. Moreover, we reiterate our conviction that the outcome of the case would not change were we to reject Mr. Withington's testimony and rely on the testimony of Mr. Hartmann or Mr. Lyons. In determining whether investors in a computer sale/leaseback transaction could reasonably expect to recoup their investment or make a profit, we must consider not only residual value, but also the amount of a taxpayer's investment, the expected or guaranteed income *600 flowing from computer leases, and expenses such as broker's fees. Gefen v. Commissioner, 87 T.C. at 1492 n.11; James v. Commissioner , 87 T.C. 905, 924 (1986). A calculation of net profit or loss which utilizes only residual value would not reflect economic reality. Further, in transactions such as the Bari transaction, profit is measured against the investor's cash outlay rather than the full purchase price including the nonrecourse note. This is because Bari's payments on the note were in effect guaranteed by the payments to Bari under the lease. Estate of Thomas v. Commissioner, 84 T.C. 412, 438 n.46 (1985). The Bari transaction involved a large balloon payment on nonrecourse purchase money debt due at the end of the Bari-CIG Products lease. Bari had an agreement to pay CIG Products the lesser of 50 percent of the net proceeds or 125 percent of the expenses upon sale or re-lease of the equipment at the end of the lease. Initially, we looked to see if the sum of the residual value which Bari could reasonably have expected at the time the balloon payment was due plus expected income flows from the equipment were greater or less than the amount of the balloon payment. [9] Because *601 residual value plus income from the lease was substantially less than the amount of the balloon payment, no possibility existed for Bari to recoup its investment or make a profit. Further computations taking CIG Products broker's fee into consideration were, therefore, unnecessary. Petitioners apparently assume that the question of Bari's ability to recoup its investment or to make a profit would be resolved in their favor, if we relied upon the testimony of Mr. Hartmann or Mr. Lyons to find that a reasonable expectation of residual value equaled or exceeded $ 6,500,000. However, in such an instance, the CIG Products broker's fee would come into play to reduce the figure for net profit or loss. The manner in which profit or loss on the Bari transaction should be computed is demonstrated in the Appendix. The computations there set forth show that with a residual value of $ 6,500,000, an apparent profit of $ 32,240 could have been obtained. However, that figure does not take into account the broker's fee which Bari would owe to CIG Products *602 for resale or release, and therefore we consider such an apparent net profit illusory. A possibility of profit on the transaction existed only if the residual value of Bari's equipment approached 30 percent or greater, figures in the outer limits of the range projected by Mr. Hartmann (and the range discussed in Mr. Lyons' proffer of testimony). Again, the fee arrangement to CIG Products would come into play to reduce such apparent profits. Moreover, even if CIG Products' fee did not reduce apparent profits, and even if we relied solely upon Mr. Hartmann's testimony, this record still does not support a residual value equal to, but not less than, the upper limits of Mr. Hartmann's range. Thus, the outcome of the case would not change. Edgar v. Finley, supra.
5. Application of Collateral Estoppel Against Petitioners
It is appropriate at this point to consider whether petitioners are collaterally estopped from denying that our decision in Coleman I is correct. Petitioners contend that our Order allowing the evidentiary hearing constituted a determination that collateral estoppel cannot apply against them. On the contrary, consideration of collateral estoppel was merely placed *603 in abeyance until resolution of the issues pertaining to compliance with the subpoena in Coleman I. As we stated previously, collateral estoppel prevents parties from relitigating issues previously decided but relating to a different tax year. Calcutt v. Commissioner, 91 T.C. at 21. However, in the present case, one of the five conditions which is necessary for application of collateral estoppel is absent. Despite the fact that three years have passed since we published our opinion in Coleman I, the taxpayers in that case, including Mr. Coleman, still have not submitted computations as required under Rule 155. Thus, there has been no entry of decision in Coleman I and our decision in that case is not yet final. Accordingly, collateral estoppel cannot be applied against petitioners. Peck v. Commissioner, 90 T.C. at 166-167. Nonetheless, the fact that all other conditions for collateral estoppel are met is highly persuasive. The issue of the residual value of the Bari equipment in Coleman II is identical to the issue resolved in Coleman I. Petitioners were parties who actually litigated the issue of residual value in Coleman I. The residual value of the Bari equipment was essential *604 to our decision in Coleman I that Bari did not have sufficient benefits and burdens of ownership for Federal tax purposes. Finally, as we have explained at length, petitioners have failed to show that the controlling facts with respect to residual value have materially changed from those in Coleman I and applicable legal rules remain unchanged. See Peck v. Commissioner, 90 T.C. at 166-167. Therefore, we adhere to our conclusion that our opinion in Coleman I is controlling on all issues which that case resolved pertaining to the Bari transaction. A further trial at this point would not be in the best interests of judicial economy or the doctrine of stare decisis. Litigation involving petitioners and the residual value of the computer equipment in the Bari transaction has consumed 3 years and has been the subject of four opinions. In light of this Court's lengthy consideration of the record regarding residual value, petitioners cannot complain that they have been denied the opportunity for a fair trial. At this point, it is appropriate that the record stand and the parties accept our determination with respect to residual value or appeal. 6. Increased Rate of Interest Under Section 6621(c) *605 Petitioners object to the imposition of the increased rate of interest on substantial underpayments attributable to tax-motivated transactions, pursuant to section 6621(c). In particular, petitioners disagree with our conclusion that the Bari transaction lacked economic substance and, therefore, was a tax-motivated transaction within the meaning of section 6621(c)(3)(A)(v). An inquiry into the economic substance of a sale/leaseback transaction is essentially an "analysis of the objective factors indicating whether the transactions had a reasonable opportunity of producing a profit, exclusive of tax benefits." Levy v. Commissioner, 91 T.C. at 854. Significant factors include: (1) The presence or absence of arm's-length price negotiations; (2) the relationship between the sales price and fair market value of the equipment; (3) the structure of the financing; (4) the degree of adherence to contractual terms; and (5) the reasonableness of income and residual value projections. Levy v. Commissioner, 91 T.C. at 856. In the present case, we found the purchase price to reflect the fair market value of the Bari equipment. Bari and CIG Products negotiated at arm's length, and Bari apparently *606 adhered to the terms of the transaction, although CIG Products twice ceased making its lease payments. Coleman v. Commissioner, 56 P-H Memo T.C. par. 87,195 at 938, 943, 53 T.C.M. 598, 602. Bari financed the transaction principally with nonrecourse debt. The nonrecourse nature of the debt allowed Bari, in June 1975, to contemplate abandoning the transaction prior to making the balloon payment. These factors also do not clearly point to either the presence or absence of economic substance. However, proof that a possibility of profit existed using the residual value would provide the requisite economic substance. Gefen v. Commissioner, 87 T.C. at 1492; James v. Commissioner, 87 T.C. at 924. We have adhered to our determination that Bari could not reasonably have expected the residual value of the computer equipment to meet or exceed the amount of the $ 6,500,000 balloon payment. The computations set forth in Appendix show that with a residual value under $ 6,500,000, no possibility existed that Bari could make a profit on this transaction. The record supports our conclusion that Bari sought only the tax benefits of deductions amounting to $ 7,462,564 in 1975. Thus, the Bari transaction *607 can be distinguished from sale/leaseback transactions which we found to have economic substance. However, even were we to reconsider our decision on economic substance, we would still find that petitioners are liable for the increased rate of interest found in section 6621(c) for 1975. The increased interest rate applies to interest payable under section 6601 with respect to substantial underpayments attributable to tax-motivated transactions. Sec. 6621(c)(1). An understatement is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). Valuation overstatements, within the meaning of section 6659(c), are tax-motivated transactions for purposes of section 6621(c). Sec. 6621(c)(3)(A)(i). There is a valuation overstatement within the meaning of section 6659(c) if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). Sec. 6659(c). We found that Bari was not the owner of the computer equipment in the Bari portfolio for Federal tax purposes. Thus, Bari had a zero basis in the computer equipment. Petitioners' claimed deductions *608 reflect an overstatement in adjusted basis of an infinite amount. Accordingly, petitioners' underpayment, substantially greater than $ 1,000, is attributable to a tax-motivated transaction within the meaning of section 6621(c)(3)(A)(i) and (v). Weis v. Commissioner, 94 T.C. 473 (1990); McCrary v. Commissioner, 92 T.C. at 857. To summarize, petitioners' motion to reconsider is denied in its entirety. Our decision in Coleman I is controlling on all issues which that case resolved pertaining to the Bari transaction. In addition, the language of our opinion is amended to the extent necessary to replace the figure $ 50,240 with the figure $ 32,240, wherever such figure appears. An appropriate order will be issued. APPENDIX POSSIBILITY OF PROFIT AT VARIOUS RESIDUAL VALUES FOR THE BARI EQUIPMENT Net profit or loss using residual value of 14 percent *
Residual value ($ 25,000,000 X .14)
$ 3,500,000 Plus net cash flow (lease payments
less note payments)
1,932,240 Less cash downpayment
(1,900,000)
Net proceeds
$ 3,532,240 Less balloon payment
(6,500,000)
Less fees to CIG Products
#    Net loss
greater than (2,967,760)
Net profit or loss using residual value of 20 percent *
Residual value ($ 25,000,000 X .20)
$ 5,000,000 Plus net cash flow (lease payments
less note payments)
1,932,240 Less cash downpayment
(1,900,000)
Net proceeds
$ 5,032,240 Less balloon payment
(6,500,000)
Less fees to CIG Products
#    Net loss
greater than (1,467,760)
Net profit or loss using residual value of 25 percent Residual value ($ 25,000,000 X .25)
$ 6,250,000 Plus net cash flow (lease payments
less note payments)
1,932,240 Less cash downpayment
(1,900,000)
Net proceeds
$ 6,282,240 Less balloon payment
(6,500,000)
Less fees to CIG Products
#    Net loss
greater than (217,760)
Net profit or loss using residual value of $ 6,500,000
Residual value
$ 6,500,000 Plus net cash flow (lease payments less note payments)
1,932,240 Less cash downpayment
(1,900,000)
Net proceeds
$ 6,532,240 Less balloon payment
(6,500,000)
Less fees to CIG Products
#    Apparent net profit
less than ### 32,240 Net profit or loss using residual value of 30 percent *
Residual value ($ 25,000,000 X .30)
$ 7,500,000 Plus net cash flow (lease payments
less note payments)
1,932,240 Less cash downpayment
(1,900,000)
Net proceeds
$ 7,532,240 Less balloon payment
(6,500,000)
Less fees to CIG Products
#    Apparent net profit
less than ## 1,032,240 *609 Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The amount $ 28,754 should read $ 28,454 at Coleman v. Commissioner, 56 P-H Memo T.C. par. 87,195 at 938, 940, 53 T.C.M. 598, 600. The amount $ 1,950,240 should read $ 1,932,240 at Coleman v. Commissioner, 56 P-H Memo T.C. par. 87,195 at 938, 940, 946, 947, 53 T.C.M. 598, 600, 605, 606. The amount $ 50,240 should read $ 32,240 at Coleman v. Commissioner, 56 P-H Memo T.C. par. 87,195 at 938, 940, 53 T.C.M. 598, 600. The amount $ 50,000 should read $ 30,000 at Coleman v. Commissioner, 56 P-H Memo T.C. par. 87,195 at 938, 944, 946, 53 T.C.M. 598↩, 603, 605.
3. Originally, Mr. Withington assigned a zero residual value to IPC channels, TELEX/Calcom discs and tapes, and DRC memory equipment based on his belief that those components were compatible with IBM 360 models. Sources of information revealed at trial by Mr. Hartmann identified that equipment as components which worked with IBM 370 models. Therefore, Mr. Withington revised his projections to assign a residual value to those components of 10 to 20 percent, consistent with his projections of the residual value of the IBM 370 systems. In addition, Mr. Withington stated that scrap value of 0.5 to 1.0 percent for IBM system 360, IBM disc, and tape equipment should be added to the aggregate figure for residual value. Finally, at trial Mr. Withington based his valuation of the IPC channels on a published list price. At the hearing in Coleman II, Mr. Withington based such valuation on the actual selling price for the IPC channels, found in documents relied upon by Mr. Hartmann at trial. Coleman v. Commissioner, 59 P-H Memo T.C. par. 90,099 at 449, 451, 58 T.C.M. 1525↩, 1527-1528.
4. Mr. Withington based his residual value projection for the Bari IBM 370-135 equipment on two studies. The first, prepared in February 1974, showed that Mr. Withington projected similar 1980 residual values for IBM 370-145 and 370-135 equipment. Based upon that similarity in patterns of projected residual values, Mr. Withington used the 1983 residual value projections for IBM 370-145 equipment contained in the May 1975 report as a basis for his projection for Bari's IBM 370-135 equipment.
5. We do not imply by such a determination that Mr. Hartmann is not an expert qualified to testify on the subject of the valuation of used computer equipment.↩
6. At the hearing, counsel for petitioners reexamined Mr. Withington at length on various factors affecting residual value projections, including price-performance (comparisons of the cost per unit between old and new or expected computer models), reverse migration (referring to users of IBM 370 equipment exchanging that equipment for IBM 360 models), and future functional requirements of computer users. These factors were discussed in Mr. Withington's expert report and the attached exhibits. The report and exhibits were made available to petitioners prior to the trial in Coleman I and petitioners cross-examined Mr. Withington on those matters at trial. Thus, although some documents admitted at the hearing also discussed price-performance, petitioners cannot now complain of lack of opportunity to rebut Mr. Withington's testimony in that respect.↩
7. Petitioners make this argument in the context of requesting reconsideration of our holding that the Bari transaction lacked economic substance. However, residual value was also critical to a determination of whether Bari had sufficient benefits and burdens of ownership of the subject computer equipment. Thus, petitioners' objection goes to our holdings on both substantive issues.↩
8. Petitioners also contend that determinations of residual value are not "valuation cases" and the Court should therefore decline to determine specific residual values. We disagree with the suggestion that a case in which we must consider which estimate of the market value of computer equipment at the end of a lease term (residual value) is reasonable and credible is not a valuation case.
9. In this context, the nonrecourse nature of the note involved is a neutral factor. Cf. Estate of Thomas v. Commissioner, 84 T.C. 412, 436↩ (1985).
*. Residual values from petitioners' "Estate of Thomas↩" argument.
#. By agreement, Bari was to pay CIG Products a broker's fee of the lesser of 50 percent of the net proceeds or 125 percent of expenses for the sale or re-lease of the Bari equipment after June 30, 1983.↩
##. In light of the fee arrangement with CIG Products, we believe these figures for apparent net profits are illusory.↩