**In re The ELDER–BEERMAN STORES CORP. an Ohio Corporation, et al., Debtors.**

**Bankruptcy No. 95–33643.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

March 20, 1997.

Richard M. Cieri, Jones, Day, Reavis & Pogue, Cleveland, OH, Scott J. Davido, Jones, Day, Reavis & Pogue, Pittsburgh, PA, Shawn J. Organ, Richard A. Chesley, Jones, Day, Reavis & Pogue, Columbus, OH, for Elder–Beerman.

Carina J. Campobasso, Tax Division, United States Department of Justice, Washington, DC, Louis H. Hill, Senior Attorney, Department of the Treasury, Internal Revenue Service, Cincinnati, OH, for U.S.

Alan R. Lepene, Thompson, Hine & Flory, Cleveland, OH, for Official Committee of Unsecured Creditors.

Louis F. Solimine, Thompson, Hine & Flory, Cincinnati, OH.

Lawrence C. Gottlieb, Siegel, Sommers & Schwartz, New York City, for Official Committee of Unsecured Trade Creditors.

Jay R. Indyke, Siegel, Sommers & Schwartz, New York City.

## DECISION AND ORDER DISALLOWING CLAIM OF INTERNAL REVENUE SERVICE

WILLIAM A. CLARK, Chief Judge.

This matter is before the court upon Debtor's objection to a proof of claim filed by the Department of the Treasury, the Internal

Revenue Service. The court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and the Standing Order of Reference entered in this district on July 30, 1984. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B)—the allowance or disallowance of claims against the estate.

## PROCEDURAL HISTORY

Elder–Beerman Stores Corporation is a corporation organized under the laws of the State of Ohio, with its headquarters in Dayton, Ohio. On October 17, 1995, the Elder–Beerman Stores Corporation (the Debtor, "Elder–Beerman") filed a petition for protection in bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (1994). On June 6, 1996, the Internal Revenue Service (the "IRS") filed a proof of claim for taxes allegedly owed by Elder–Beerman for the 1992, 1993, 1994 and 1995 tax years. The claim was based on Elder–Beerman's receipt of construction and fixture allowances (the "tenant allowances") from various developers (collectively the "Developers") of thirteen shopping center projects in which Elder–Beerman either opened a new store or expanded an existing location.[1]

On October 8, 1996, Elder–Beerman filed its objection to the IRS's claim on the following grounds:

1. The stores and the tenant allowances at issue are:

| | |
|---|---|
| Huber Heights (107) | —$ 4,073,600 |
| Beaver Creek (115) | —$ 10,000,000 |
| Springfield (116) | —$ 2,156,040 |
| Chillicothe (130) | —$ 150,000 |
| Wooster (147) | —$ 1,449,068 |
| Benton Harbor (160) | —$ 4,366,536 |
| Midland (161) | —$ 3,976,760 |
| Jackson (163) | —$ 3,720,000 |
| Evansville (164) | —$ 6,000,000 |
| Beloit (165) | —$ 3,720,000 |
| Carbondale (173) | —$ 840,000 |
| Green Bay (183) | —$ 3,000,000 |
| Kokomo (184) | —$ 300,000 |

Of the $43,752,004 in tenant allowances received from the developers, $36,907,321 was expended on the construction of the Elder–Beerman stores and $6,884,683 was spent on the related trade fixtures, furniture and equipment. The IRS claim, however, concerns only $39,250,322 of the total tenant allowances received from the developers which includes approximately $348,805 of allowances received from certain Elder–Beerman vendors. Elder–Beerman has already included in income and paid tax on $4,501,682 of the tenant allowances received in

1) The tenant allowances cannot be considered income to Elder–Beerman because they were received as a reimbursement of costs for Elder–Beerman's construction of the developers' stores which Elder–Beerman subsequently leased from the developers.

2) Even if Elder–Beerman could be deemed to "own" the stores, the tenant allowances would be contributions to capital excludible from Elder–Beerman's income under Section 118 of the Internal Revenue Code. Likewise, the tenant allowances received from the developers and vendors and spent on fixtures, furniture, and equipment would also be excludible contributions to capital.[2]

The IRS responded on November 6, 1996 with its supplemental response to Elder–Beerman's objection. On November 22, 1996, Elder–Beerman filed its response to the supplemental response of the IRS. This was followed by Elder–Beerman's December 24, 1996 motion for summary judgment, the IRS's January 22, 1997 cross-motion for summary-judgment, and the January 27, 1997 reply memorandum of Elder–Beerman. The court conducted a full hearing in this matter

---

prior tax years for the acquisition of fixtures, furniture, and equipment.

2. In the Debtors' Consolidated Objection to Claims Filed by the Internal Revenue Service and Memorandum in Support Thereof, Elder–Beerman's objection centered on (1) whether Elder–Beerman must pay tax on nearly $40 million used to build department stores on behalf of various shopping center developers when Elder–Beerman never owned the stores and (2) whether Elder–Beerman must pay tax on more than $5 million expended on furniture and fixtures for the stores when the amounts expended were tax-free contributions to Elder–Beerman's capital by the same developers. Debtors' Consol. Objection, Doc. # 190–2, at 1–2. As the bases for its objection, Elder–Beerman asserted that the allowances cannot be considered income to Elder–Beerman because the allowances are not accessions to Elder–Beerman's wealth, id. at 8, and even if Elder–Beerman could be found to "own" the stores, the allowances are contributions to Elder–Beerman's capital Id. at 12. Elder–Beerman also asserted that the furniture and fixture allowances were contributions to Elder–Beerman's capital. Id. at 16.

on January 27 and 28, 1997. The court then took the issues under advisement for subsequent decision.

In spite of the amount of evidence adduced at the January hearing, the record remains far from complete, however, the court has endeavored to reach a decision consistent with the evidence before it, giving due regard to the burden of proof assumed by Elder–Beerman.[3] Having thoroughly reviewed the pleadings and given independent consideration to the weight and credibility of the testimony of the witnesses and the numerous exhibits and depositions filed in this matter, the court is now prepared to render its decision.

Accordingly, pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52, this court has made the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1) Ground leases typically involve a landlord leasing real estate to a tenant who then constructs a building on the leased property. The tenant owns the building during the term of the lease and pays rent to the landlord for the underlying property. Upon the termination of the lease, the tenant will surrender its building to the landlord. In situations where a landlord refuses to sell the underlying real estate, a ground lease is often the only way that a tenant can construct its own building at a certain location.

2) A building lease involves a landlord leasing a building and the underlying land to a tenant. Although the landlord will always own the building and the land, during the term of the lease the tenant will have an exclusive right of possession. At the end of the lease term, the tenant will vacate the leased premises.

3) Elder–Beerman has never utilized ground leases.

4) An anchor store is usually a retail department store located within a shopping center complex that serves to draw customers and other specialty stores into the shopping center. Anchor stores are crucial to the overall success of such shopping centers. For purposes of financing and the overall viability of the projects, developers of such shopping center complexes want anchor stores to make long-term commitments to do business there. Accordingly, the anchor stores have varying degrees of bargaining power in their negotiations with the developers.

5) Elder–Beerman is an anchor store. However, it has never had the bargaining power of the larger retail department stores.

6) Elder–Beerman has not had sufficient capital to finance the construction of its own buildings or the acquisition and renovation of existing buildings, nor has it had the capital necessary to acquire the underlying real estate. As a result, instead of spending its limited financial resources on "bricks and mortar," Elder–Beerman has believed that its money was better spent on inventory and merchandising. Consequently, Elder–Beerman has chosen to enter into long-term leases of buildings and land from the developers of shopping center projects.

7) Prior to 1990, developers would generally build, at their cost, the "vanilla box," or building shell, of each store. Elder–Beerman would then bear the responsibility for completing the store interior ("interior build-out"), including fixtures, furniture

---

3. Neither the Bankruptcy Code nor the Bankruptcy Rules specifically allocate the burden of proof in a case in which an objection to a federal tax claim is at issue. Outside of bankruptcy, however, the burden of proof is generally on the taxpayer and not the IRS. *See Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Although there is a split of authority among the circuit courts of appeals, most of the circuits that have addressed the issue have held that the burden of proof should not be placed on the IRS because the burden-of-proof rules ap-

plied in non-bankruptcy proceedings should also apply in bankruptcy proceedings. *See In re Landbank Equity Corp.,* 973 F.2d 265, 269–70 (4th Cir.1992); *Resyn Corp v. United States,* 851 F.2d 660, 662–63 (3d Cir.1988); *In re Uneco, Inc.,* 532 F.2d 1204, 1207 (8th Cir.1976). *But see California State Board of Equalization v. Official Unsecured Creditors' Comm. (In re Fidelity Holding Co. Ltd.,)* 837 F.2d 696, 698–99 (5th Cir.1988). Based on the above authority, Elder–Beerman agreed to assume the burden of proof in this matter.

and equipment. Elder–Beerman would have to utilize its own money to complete the interior build-out. Following completion, Elder–Beerman would then occupy the building as a tenant, leasing the land and building from the developers through monthly lease payments.

8) Historically, there were several drawbacks in having the developers construct the building shell of each store to be leased by Elder–Beerman. Having other construction commitments within the shopping center project, the developers could not focus on the specific needs of the Elder–Beerman store and this minimized their responsiveness to Elder–Beerman's requests. Consequently, when problems or delays in construction were experienced, the Developers' response was often lacking. These delays frequently resulted from the Developers' lack of familiarity with Elder–Beerman's construction needs and expectations, since virtually none of the Developers' contractors and subcontractors had previously built an Elder–Beerman store. This was particularly important in the finishing stages, where layout, design and decor were extremely important to a retail merchandiser like Elder–Beerman. These delays to the opening of the store or unsatisfactory store construction translated directly into lost profits.

9) To combat these problems, Elder–Beerman decided to take a more active role in the construction of each of the stores it planned to lease. Instead of having the developers complete the building shell, Elder–Beerman entered into negotiations to construct the entire store for the developers in return for the reimbursement of their construction and fixturing costs.

10) Developers realized that Elder–Beerman had contractors that followed them from store to store. Rather than individually bid out the work and address the problems of construction, the developers preferred to have Elder–Beerman construct the stores.

11) Elder–Beerman benefited by taking over control of the construction, because the contractors and subcontractors it select-ed could focus exclusively on the construction of the Elder–Beerman store without the distraction of constructing other mall tenants' buildings.

12) Developers recognized the benefits of Elder–Beerman taking control of construction, because Elder–Beerman often could do so more effectively and at less cost.

13) Elder–Beerman had personnel experienced in the construction process who enabled Elder–Beerman to better control the costs of construction.

14) This "learning-curve" benefit helped Elder–Beerman to better control costs and negotiate better prices, because construction waste, the product of mistakes and errors, was minimized.

15) Once responsible for all construction, Elder–Beerman produced faster and better results. Delays were minimized, thus eliminating the lost profits from delayed store openings. Elder–Beerman's construction work was cost-effective for the developers.

16) On more than one occasion, Elder–Beerman's control of construction enabled it to complete an entire store months ahead of schedule.

17) Commencing in 1991, Elder–Beerman began to construct the stores it would later lease from the developers. It hired the contractors and subcontractors and made the requisite payments. Often, the developers and Elder–Beerman had mutual rights of approval over the construction plans of the individual stores and shopping centers.

18) Each agreement was intended by the parties to be a lease. The terms of each lease were negotiated by the parties in arms-length transactions. With regard to each lease, the parties were independent and not related. In particular, the negotiations revolved around the amount of rent and tenant allowance.

19) In each lease, Elder–Beerman received a tenant allowance as reimbursement for its construction costs. Even before a tenant allowance was negotiated with a developer, Elder–Beerman would prepare a construction budget for the pro-

ject and base its negotiations on that budget. The tenant allowances never equaled the total cost of completing the building shell and the interior build-out.

20) Although the precise method of reimbursement varied, payment of each tenant allowance was tied to the completion of the entire store or to the completion of different stages of the construction process. Generally, the developers paid Elder–Beerman only after Elder–Beerman submitted a claim for reimbursement on a standard AIA (American Institute of Architects) form entitled "Application and Certificate for Payment." The form listed Elder–Beerman as the "contractor" and the developer as the "owner" of the building being constructed. Elder–Beerman's payment application described the completed work and certified to the developer that a payment was due. Also, the developers required Elder–Beerman to supply them with lien waivers from the various contractors and subcontractors before any reimbursement was made to Elder–Beerman. This was required so that the Developers would be sure the ownership of their property was "clean" (*i.e.*, not encumbered by contractor or subcontractor liens).

21) Elder–Beerman spent all of the tenant allowances received from the developers on the construction of the building shells, on completion of the interior build-out, and on furniture, fixtures and equipment used in the stores.

22) The amount of the tenant allowances differed from lease to lease. They were usually based on the square-footage of each store.

23) Each lease provided that Elder–Beerman would pay a fixed and percentage rent for the lease of the store from the developer. The rents paid for the thirteen stores constructed by Elder–Beerman were within approximately the same range of rents paid for stores previously constructed by the developers. The rents paid by Elder–Beerman were also within the same range of rents paid by other anchor stores.

24) Each lease provided that the developers would lease the store to Elder–Beerman for a fixed period, generally 20 years, with a finite number of options to extend, in return for Elder–Beerman's payment of the rent. In most of the leases, Elder–Beerman would also be responsible for the payment of common area maintenance ("CAM") charges.

25) The leases provided that Elder–Beerman would be responsible for general repairs and maintenance.

26) The leases were generally "net leases" which are standard in retail and commercial leasing arrangements for both anchor stores and other shopping center tenants. Under the leases, Elder–Beerman would usually be responsible for its pro rata share of real estate taxes and insurance. The developers, however, were ultimately responsible to the taxing authorities for payment of all taxes. The developers also bore the ultimate risk of any loss or damage to the stores.

27) Because the developers held title to the buildings they could depreciate the buildings, use the buildings as collateral for a loan, and sell or transfer title to the buildings.

28) At the end of the lease, any residual value in the stores would belong to the developers. The developers, alone, would enjoy any appreciation in value the building might have. Similarly, if the value decreased, that risk would fall upon the Developer.

29) The leases set forth various conditions under which the developers, Elder–Beerman, or both could terminate the lease prior to its scheduled termination. Generally, if the developer could not obtain the necessary financing (which would, in part, fund the payment of the tenant allowances), Elder–Beerman would have the option of terminating the lease. In addition, Elder–Beerman could usually terminate a lease if the other anchor store tenants were not conducting business in the shopping center.

## CONCLUSIONS OF LAW

Section 61(a) of the Internal Revenue Code (the "IRC") provides that "gross income" includes "all income from whatever source derived." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–30, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955). The purpose of Section 61(a) is to "tax all gains except those specifically exempted." *Id.*

■ In determining what sort of economic benefits qualify as income within the meaning of Section 61(a) the United States Supreme Court has referred to "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203, 208, 110 S.Ct. 589, 593, 107 L.Ed.2d 591 (1990); *Glenshaw Glass Co.*, 348 U.S. at 431, 75 S.Ct. at 476. What is or is not income must be determined in each case according to its substance, without regard to form. *See Helvering v. Edison Bros. Stores*, 133 F.2d 575 (8th Cir.), *cert. denied*, 319 U.S. 752, 63 S.Ct. 1166, 87 L.Ed. 1706 (1943).

■ In applying this doctrine of substance over form, courts look to the objective economic realities of a transaction rather than to the particular form the parties may have employed. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978). Within the field of taxation, the courts are concerned with "substance and realities, and formal written documents are not rigidly binding." *Helvering v. F & R Lazarus & Co.*, 308 U.S. 252, 255, 60 S.Ct. 209, 210, 84 L.Ed. 226 (1939). A transaction is generally effective for income tax purposes only if its economic substance is consonant with its intended tax effects. *See Frank Lyon*, 435 U.S. at 573, 98 S.Ct. at 1291.

Herein, the IRS argues that, for tax purposes, the transactions entered into between Elder–Beerman and the developers were no more than mere shams, structured by Elder–Beerman to hide income. The IRS believes that the transactions lacked any true economic substance. The IRS claims that these agreements could not be leases because, based on the facts, Elder–Beerman actually owned each of the stores that it was purportedly leasing from the developers. Arguing that the tenant allowances were paid by the developers as incentives to induce Elder–Beerman to locate its stores in their shopping centers, the IRS contends that the payments were actually income to Elder–Beerman, as opposed to reimbursements for the construction of the developers' stores. As part of its ownership theory, the IRS asserts that Elder–Beerman used the payments from the developers to finance the construction of its own stores. Such assertions, however, ignore the economic realities of the transaction.

The IRS claim is based on the Tax Court's "benefits and burdens of ownership test" set forth in *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1981 WL 11305 (1981), and *Coleman v. Commissioner*, 53 T.C.M. (CCH) 598, 1987 WL 40311 (1987), *aff'd*, 16 F.3d 821 (7th Cir.1994).[4] Although the test has been consistently applied in "lease vs. sale" transactions, the IRS asserts that the "benefits and burdens of ownership test" is the proper inquiry for determining ownership in this situation. *See* Internal Revenue Service Industry Specialization Program Retail Industry Coordinated Issue Paper on Tenant Allowances to Retail Store Operators, Issued October 8, 1996 (the "ISP Paper") reprinted at Daily Tax Reporter No. 196(BNA).[5]

---

**4.** The Tax Court crafted the test based on the following factors: (1) whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity interest was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the prof-

its from the operation and sale of the property. *Grodt & McKay Realty*, 77 T.C. at 1237–38; *see also Coleman v. Commissioner*, 53 T.C.M. (CCH) 598, 1987 WL 40311 (1987), *aff'd*, 16 F.3d 821 (7th Cir.1994). As will be discussed later, the IRS's claim will also fail under this test.

**5.** The Industrial Specialization Program is a national program to provide oversight and coordination of all issues in a designated industrial area. The program is designed to ensure the

This court agrees that *Grodt & McKay Realty* and *Coleman* set forth factors that provide a useful guidepost for its analysis, however, the "benefits and burdens of ownership test" must be applied within the context of the substance over form doctrine set forth by the United States Supreme Court in *Frank Lyon*, 435 U.S. at 573, 98 S.Ct. at 1298. The proper focus is on whether the transactions between Elder–Beerman and the developers should be respected under the mandates of *Frank Lyon* and progeny.[6]

 Where there is a genuine transaction with economic substance which is compelled or encouraged by business realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features, the form of the transaction adopted by the parties governs for tax purposes. *Frank Lyon*, 435 U.S. at 583–84, 98 S.Ct. at 1303–04. In order to disregard a transaction as a "sham" transaction, using a two-pronged inquiry, the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists. *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir.1985) (following *Frank Lyon*). The first prong of the "sham inquiry," the business purpose inquiry, is a subjective test and simply concerns the motives of the taxpayer in entering the transaction. The second prong requires an objective determination of whether a reasonable possibility of profit exists apart from any tax benefits. *Id.* at 92–94; *see also Rose v. Commissioner*, 88 T.C. 386, 409–10, 1987 WL 49274 (1987), *aff'd*, 868 F.2d 851 (6th Cir.1989). Under the first prong, the court finds that there is ample evidence to support Elder–Beerman's claim that there were significant business purposes, independent of tax considerations, motivating its transactions with the developers.

There was uncontradicted testimony that Elder–Beerman made the conscious decision not to invest its limited financial resources in "bricks and mortar." It did not have the necessary amount of capital to finance the acquisition or construction of its own stores. Instead, Elder–Beerman chose to lease building space and concentrate its resources on inventory and merchandising.

In the past, developers would construct a building shell and Elder–Beerman would then complete the interior build-out, including the provision of fixtures, furniture and equipment. For tax purposes, Elder–Beerman would depreciate all such costs. Although this method of construction was employed for several years, Elder–Beerman was

uniform and appropriate application of the federal tax laws. *See generally* 1994–27 I.R.B. 124.

This ISP paper embraces the test set forth in *Grodt & McKay Realty* as the means of determining tax ownership of leasehold improvements. ISP paper, at 4. Specifically, the ISP paper addresses the tax consequences to an anchor store upon its receipt of cash from a shopping center developer in conjunction with entering into a lease. *Id.* at 1. The ISP paper focuses on interior build-out, other tenant work and leasehold improvements. *Id.* According to the ISP paper, if the anchor store can be found to own the leasehold improvements, then the anchor store has an accession to wealth and the cash received from the developer is includible in the anchor store's gross income. *Id.* at 1–3. The ISP paper does, however, recognize the universal rule that any amounts received from the landlord and expended by the tenant on assets that are owned by the landlord cannot be characterized as income to the tenant. *Id.* at 2, 7; *see* Treas. Reg. § 1.167(a)–4; *see also* Treas.Reg. § 1.162–11(b)(1).

**6.** In *Frank Lyon* the Supreme Court upheld the validity of a taxpayer's transaction under facts quite similar to the facts presently before this court. 435 U.S. at 573, 98 S.Ct. at 1298. Due to regulatory constraints, Worthen Bank was unable to finance and construct its own building. Worthen Bank was forced to seek an alternative solution that would provide it with use of the building in question. Ultimately, Worthen Bank and Frank Lyon Company, an unrelated entity, structured a transaction in which Worthen constructed the building for Frank Lyon which, in effect, reimbursed Worthen for the costs of construction. Frank Lyon then leased the building to Worthen on a long-term basis. The building lease was a "net lease", under which Worthen was responsible for taxes, insurance and repairs. In refusing to hold the transaction a sham, the Supreme Court relied on several factors, including the bargaining process, the bona fide character of the negotiations, the reasonableness of the numbers involved, Frank Lyon's legal title to the building, Frank Lyon's liabilities as sole owner of the building, and the risk borne by Frank Lyon that Worthen might default on its obligations. *Id.*

not always satisfied with the results. Consequently, Elder–Beerman and the developers negotiated lease agreements in which Elder–Beerman would construct the entire store and receive "tenant allowances" as reimbursement for the costs of construction.

Elder–Beerman chose this arrangement because it eliminated the delays and inefficiencies in the construction of the stores, thereby, enabling Elder–Beerman to commence its business operations sooner. As for the developers, they no longer had to construct their own stores. Developers could provide reimbursement to Elder–Beerman in the form of the tenant allowances, and Elder–Beerman would construct the stores for them. The end result remained the same. Elder–Beerman would lease the completed stores from the developers.

Prior to assuming responsibility for the complete construction of the stores, Elder–Beerman bore the costs of finishing, fixturing and furnishing the interiors of the stores. Under the new leasing arrangements, with the shift in construction responsibility and the payment of tenant allowances, Elder–Beerman's initial costs were reduced. The tenant allowances, however, rarely equaled the costs of constructing the stores. Except for the Benton Harbor and Midland stores, Elder–Beerman bore a portion of the construction costs of each of the other stores. This was the end result of serious negotiations between the parties.

In its lengthy negotiations with the developers, Elder–Beerman had varying degrees of bargaining power and this was reflected in the tenant allowances paid by the developers. Elder–Beerman wanted to lease a store as completed as possible. For example, depending on the needs of the developer, the desirability of an Elder–Beerman store compared to a competitor's store, and Elder–Beerman's cost efficiency in constructing the store, Elder–Beerman could negotiate a tenant allowance figure that would reimburse it for a significant percentage of the costs of completing a store. Conversely, when its negotiating position was weaker, Elder–Beerman would only receive reimbursement for the cost of the building shell.

In either scenario, Elder–Beerman was responsible for the unreimbursed costs incurred in completing the store, however, those costs were always a factor in the negotiations. As part of its initial cost analysis, Elder–Beerman would determine the potential profitability of each transaction based on a range of cost inputs. It then based its negotiations and ultimate decision upon those figures. During the negotiations, Elder–Beerman certainly and understandably sought to keep that figure as low as possible, yet was rarely successful in obtaining a tenant allowance which covered all construction costs.

Contrary to the assertions of the IRS, there was nothing illogical, in a business or any other sense, about Elder–Beerman investing in stores that it would never own. Elder–Beerman made a decision to invest in the stores that amount of capital that enabled it to make a profit. What the developers would not provide up-front through the tenant allowances, Elder–Beerman had to provide itself. Often, this involved items of interior build-out, fixtures, furniture and equipment. This reflected, in part, the costs inherent in creating a store suited for Elder–Beerman's business needs. When Elder–Beerman did commit its capital to the store, it rightfully depreciated those amounts representing the consumption of that capital. *See* Treas.Reg. § 1.167(a)–4.

The IRS would have the court find that there were no legitimate business purposes underlying Elder–Beerman's transactions with the developers. The IRS theorizes that the leasing arrangement, Elder–Beerman's control of construction, and the characterization of the tenant allowances as reimbursement were merely elaborate efforts undertaken to disguise the true nature of the payments. The IRS views the tenant allowances as no more than incentive payments, money given to Elder–Beerman as an inducement to or reward for locating its stores in the developers' shopping centers. According to the IRS, Elder–Beerman used those proceeds to help finance the construction of its own stores.

This court, however, finds such a theory incompatible with the substance and econom-

ic realities of the transactions entered into by the parties. When it negotiated for a higher tenant allowance, Elder–Beerman was simultaneously negotiating to lease a more complete store from the developer. The rent stipulated in the agreement would, in part, reflect those numbers. In addition, all of the tenant allowances were received in reimbursement for construction expenses and were, in fact, tied to the completion of construction. The court holds that the evidence shows that Elder–Beerman did have valid business reasons for choosing to lease the stores, for assuming the responsibility for construction, for accepting reimbursement as tenant allowances, and for investing its capital in the developers' stores.

■ The fact that Elder–Beerman might have taken into account the favorable tax consequence of choosing a particular structure for its transactions does not preclude the court's finding that Elder–Beerman satisfied the business purpose inquiry.[7] This court cannot and will not ignore the reality that the tax laws affect the shape of nearly every business transaction. *See Frank Lyon*, 435 U.S. at 580, 98 S.Ct. at 1302 (citation omitted). After all, it is well-accepted that taxpayers are free to use any lawful means to minimize their taxes, or to avoid them altogether. *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). All that is required is that the transactions be motivated by business realities independent of tax considerations. Only transactions shaped solely by tax avoidance features are at risk.

The court also finds that the second prong of the sham inquiry weighs in favor of respecting the transactions as structured. The evidence indicates that the transactions had economic substance apart from any purported tax benefits. Elder–Beerman had a clear profit motive in entering into these transactions with the developers. The IRS does not

appear to seriously contest Elder–Beerman's profit motives in these transactions and, although there are no detailed forecasts or other economic indicators in evidence, there is also no evidence suggesting that these transactions had no reasonable possibility of profit.

After carefully weighing the evidence, this court can only conclude that, as a whole, the transactions were not shams, but rather genuine leasing arrangements compelled by business realities. The transactions had economic substance and were in no way motivated solely by tax avoidance considerations.

■ Accordingly, the transactions will be respected as structured by the parties. Elder–Beerman and the developers unambiguously entered into lease agreements in which Elder–Beerman constructed the stores for the developers. The tenant allowances were basically reimbursements of those construction costs. Each item ultimately purchased with the tenant allowances must be deemed owned, for legal and tax purposes, by the developers, regardless of whether it constitutes part of the building shell, interior build-out, fixturing, furniture or equipment. Elder–Beerman negotiated to lease as complete a store as possible.

■ To the extent the tenant allowances did not provide a complete store, Elder–Beerman had to invest its own capital in the stores. Regardless of which party might be considered to legally own such additional property, Elder–Beerman is deemed to own the property, for tax purposes.

Although the court could so decide under the *Frank Lyon* analysis alone, the court's decision is also consistent with the "benefits and burdens of ownership test" relied upon by the IRS and promulgated in its ISP paper.[8]

---

**7.** There was testimony that indicated Elder–Beerman may have structured the leases, in part, to avoid the unfavorable tax consequences of having to include portions of the tenant allowances in income. Apparently, the IRS forced Elder–Beerman to include some tenant allowances in income based on certain language in a lease. At that time, Elder–Beerman acceded to

the inclusion, however, those past inclusions are now effectively disputed. This evidence does not indicate a systematic effort to elevate form over substance, despite Elder–Beerman's voiced concerns not to "get caught" the same way again.

**8.** *See* note 5 at 554–55.

The IRS asserts that the majority of the test's eight factors point clearly to Elder–Beerman's ownership of the stores for tax purposes, or at least to its ownership of the interior build-out and fixtures, furniture and equipment. The IRS argument, however, is misguided and fails to correctly apply the law to the facts.

The first four factors weigh against the IRS. Title did not pass. The IRS concedes that legal title did not pass to Elder–Beerman in any of the thirteen leases. Both the developers and Elder–Beerman treated these transactions as leases. There is also no question that Elder–Beerman failed to acquire any equity interest in any of the thirteen buildings in question. Finally, none of the leases created any obligation on the part of the developers to execute and deliver a deed to Elder–Beerman. The remaining four factors also weigh against the IRS.

Elder–Beerman obviously had the right of possession of the buildings *during the term of the lease,* however, the same is true of every lease, commercial and residential. Moreover, while Elder–Beerman (like any tenant) would expect to receive profits from the operation of the store, the actual focus is on the profits from the operation and sale of the property. In other words, only the developers were entitled to the lease rents and the gains on any future sale of the properties.

Ignoring the economic realities of "net leases" in commercial real estate, the IRS seriously misconstrues Elder–Beerman's obligations to reimburse the developers for property taxes and insurance premiums. Elder–Beerman's obligations were contractual. If Elder–Beerman should default or otherwise fail to pay the real estate taxes on the property, the developers would ultimately be accountable. The taxing authorities would look to the developers for payment and only the developers would risk lien encumbrances or tax foreclosures. Likewise, the developers bore the ultimate risk of loss or damage to the property. The developers had to insure the premises. Elder–Beerman only had to reimburse the developer for the premiums. Again, if Elder–Beerman should fail or neglect to make the payments, that would in no way abrogate the developers' need to insure their premises. The developers bore the risk of loss by fire or other catastrophe.

Clearly, under *Grodt & McKay Realty,* the benefits and burdens of ownership flow to the developers, and not to Elder–Beerman, such that at a minimum the building shell could never be deemed owned by Elder–Beerman. In its ISP paper, however, the IRS promulgates additional factors that it contends indicate certain leasehold improvements may be deemed owned by Elder–Beerman.[9]

The IRS relies upon the following additional factors: (1) whether the tenant carries personal property and liability insurance on the interior build-out; (2) whether the tenant is the beneficiary under those policies; (3) whether the tenant is responsible for replacing the interior build-out if it wears out prior to the end of the lease term; and (4) whether, if the usefulness of the interior build-out extends beyond the lease term, the tenant has a remainder interest in the improvements. ISP Paper at 3. The court can find no legal support for these additional factors.[10] Moreover, they provide little support for the IRS's claim.

Here, as in the rest of its case, the IRS fails to comprehend the economic realities underlying these transactions. "Net leases," whereby landlords shift certain responsibilities to their tenants, are quite common in commercial leasing, especially long-term retail leases. In their negotiations, the developers effectively shifted the responsibility for taxes, insurance, and repairs and replacement to Elder–Beerman. These transactions were "net leases."

Generally, the leases required the developers to carry insurance on the building shell

---

**9.** Apparently, the IRS includes the entire interior build-out of a store in its definition of leasehold improvements. Fixtures, furniture and equipment could also be analyzed in this fashion.

**10.** Albeit, there is a decision that addresses whether a useful life in excess of the lease term is reasonably expected to exist. *Coleman v. Commissioner,* 53 T.C.M. (CCH) 598, 1987 WL 40311 (1987), *aff'd,* 16 F.3d 821 (7th Cir.1994).

and interior build-out and Elder–Beerman was to insure the remainder. Elder–Beerman was further responsible for reimbursing the developers for their insurance premiums. Each of the parties was the beneficiary of its respective policy. The leases also required that Elder–Beerman repair and replace interior build-out and other interior property, as it wore out during the term of the lease. Yet, regardless of the term of the lease, Elder–Beerman had no proprietary interest in such improvements.

In all, these factors do not weigh in favor of the IRS. Instead, they support the court's finding that the developers, not Elder–Beerman, owned the assets effectively purchased with the tenant allowances. Elder–Beerman was merely a conduit for the developers' money.[11]

## CONCLUSION

Based upon the evidence presented, this court finds that the transactions between Elder–Beerman and the developers were motivated by significant business realities, not solely by tax avoidance considerations, and were possessed of such economic substance that the court must honor the allocation of rights and duties effectuated by the parties.

It is hereby ORDERED that the claim of the Internal Revenue Service is DISALLOWED.

---

**11.** Alternatively, even if Elder–Beerman were found to own the assets purchased with the tenant allowances, and the tenant allowances were consequently found to have been income to Elder–Beerman, the tenant allowances would be excludible from income under Section 118 of the Internal Revenue Code which provides that a corporation's gross income does not include contribution to capital. The Sixth Circuit has already held that a developer's payments to a prospective anchor store tenant were excludable from income under Section 118. *See Federated Dep't Stores, Inc. v. Commissioner*, 426 F.2d 417 (6th Cir.1970); *see also United States v. Chicago, Burlington & Quincy R.R. Co.*, 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973); *May Dep't Stores Co. v. Commissioner*, 33 T.C.M. 1128, 1974 WL 2347 (1974), *aff'd per curiam*, 519 F.2d 1154 (8th Cir.1975).